GRINNELL v. RAILROAD COMPANY.

1. The grant made to Iowa by the act of May 15, 1856, c. 28 (11 Stat. 9), to aid in the construction of a railroad from Davenport to Council Bluffs, is *in præsenti*, and, with certain exceptions therein specified, it vested in the State the title to every section of public land designated by odd numbers for six miles in width on each side of the road, when the line thereof should be definitely fixed.

2. The act authorized the State, subject to the approval of the Secretary of the Interior, to select, within the limit of fifteen miles of the road, land in alternate sections equal in amount to that which, within the six-mile limit, had been sold or otherwise appropriated by the United States. *Quære*, Does the right to any particular section or part of section, beyond the six-mile limit, vest in the State before the selection of it has been reported to and approved by the proper officer.

3. After the lands had been duly certified to the State or to the railroad company, to which she transferred them, the legal title thereto was subject to be defeated only by the United States, should there be a breach of any condition annexed to the grant, and it was not divested by a change of the location of part of the line of road authorized by the act of June 2, 1864, c. 103 (13 Stat. 95), although they are not situate within twenty miles of the relocated line. Subsequent settlers could, therefore, acquire no right thereto under the pre-emption or the homestead laws.

ERROR to the Supreme Court of the State of Iowa.

The facts are stated in the opinion of the court.

*Mr. Saul S. Henkle* and *Mr. John S. Hauke* for the plaintiffs in error.

*Mr. Thomas S. Withrow* for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

Actions in the nature of ejectment were brought by the Chicago, Rock Island, and Pacific Railroad Company against numerous persons in different courts of the State of Iowa, and heard and decided together by stipulation on appeals to the Supreme Court, where the judgments of the lower courts in favor of the plaintiff were affirmed. The defendants sued out this writ of error.

The plaintiff asserted title under the act of Congress of May 15, 1856, c. 28 (11 Stat. 9), granting lands to the State of Iowa for railroad purposes; and the counsel of the plaintiffs in error correctly states in his brief that the only question presented by the record is, whether the railroad company has under that grant acquired title to any lands within the old fifteen-mile limit of the Mississippi and Missouri Railroad Company, certified to the State under the grant by the Department of the Interior for the benefit of that company, but which were left outside of the new twenty-mile limit by a change of location of the old line, made by the present company under the act of Congress of June 2, 1864, c. 103 (13 id. 95), amendatory of that act.

· The material facts on which the decision of this question depends may be thus succinctly stated : By the first act, Congress made a grant to the State of Iowa for the purpose of aiding in the construction of four railroads across the State from points on the Mississippi River to points on the Missouri River. One of these was a road from Davenport to Council Bluffs. The grant was of every alternate section of land designated by odd numbers, for six sections in width, on each side of said roads; and in case it should appear that the United States had, when the lines or routes of said roads were definitely fixed, sold any sections or parts of sections granted as aforesaid, or the right of pre-emption had attached to the same, then the State by its agent or agents might select other odd sections in lieu of those thus deficient, within a limit of fifteen miles on each side of said roads.

The State of Iowa, by an act of its legislature approved July 14, 1856, granted to the Mississippi and Missouri Railroad Company the lands which were by the act of Congress

appropriated to the construction of the road from Davenport to Council Bluffs. That company accepted the grant, and on the eleventh day of September, 1856, filed in the General Land-Office at Washington a map showing the route which it had adopted for its road, some unimportant corrections of which were made by another map filed April 1, 1857.

On the 4th of September, 1858, the agent of the company and the State reported to the General Land-Office the selection of lands in lieu of those which had been sold or to which the right of pre-emption had attached, and on the 27th of December, 1858, the lands thus selected, and those which were in place, were certified to the State by the Commissioner of the General Land-Office. These lands in place and those selected and certified to the State under the act of 1856 include all the lands in controversy in this suit.

By the act of June 2, 1864, Congress authorized a change of location of the uncompleted part of this road, so as to secure a better and more expeditious line for connection with the Iowa branch of the Union Pacific Railroad; and the plaintiff below, which had succeeded to all the rights of the Mississippi and Missouri Railroad Company, availed itself of the privilege thus conferred, and so changed the route as to place it at some points south of the fifteen-mile limits of the grant, as ascertained by the first location, and the road was completed on this route to Council Bluffs in 1869. After all this, the plaintiffs in error settled upon the lands in controversy, which were within the limits of the location made in 1856, and without the twenty-mile limits of the amendatory act of 1864, which will be presently noticed, and proceeded by the appropriate steps to assert rights under the homestead and pre-emption laws of the United States. The Land Department refused to recognize their right to the lands, but being in possession, and sued therefor by the railroad company, they say that the company has no title, because it lost whatever right it had to the lands by the change of the location, and because locating the road as now completed does not bring these lands within the limit of either the original or the amendatory act.

Two inquiries are thus suggested, namely : Had the railroad company acquired a title or a vested right to the lands in con-

troversy prior to the act of 1864, and to the change of location? and, if it had, what was the effect of that change on its right to the lands left by the change outside of the limits prescribed by both acts?

The grant under the act of 1856 was, as has been often said, a grant *in præsenti*, and though exactly what this means has been the subject of much controversy, we think its ascertainment is not difficult. The only doubtful element of the problem is the location of the road, which, by the terms of these grants, is necessary to identify the sections granted on each side of it. Whenever that is done so that a surveyor or the officers of the Land Department can protract the line of the route on the maps of the public lands within the limit of the grants, the identity of the lands granted is mathematically ascertained, and the title relates back to the date of the grant.

So far as lands are found in place when this is done, not coming within the exceptions as sold or held under pre-emption, the title, or at least the right to this land in place, is at once vested in the State or in the company to which the State has granted it, and the means of ascertaining precisely what lands have passed by the grant is to be found in the map of the line of the road, which is filed in the General Land-Office under provisions of the statute. As regards the lands to be selected in lieu of those lost by sale or otherwise, it may be that no valid right accrues to any particular section or part of a section until the selection is made and reported to the land-office, and possibly not then until the selection is approved by the proper officer.

None of these difficulties arise in the present case. The location was made and the map filed in the land-office, the selection of lieu lands was made and approved, and the entire list regularly certified to the State of Iowa, as early as December, 1858, and with this certificate the last act of the United States which could in any event be held necessary to passing the title was performed, and either the State of Iowa or the railroad company — it is immaterial which for the purposes of this suit — had become invested with the full legal title to the lands so certified.

In this condition of affairs the Mississippi and Missouri Rail-

road Company executed, to obtain money to build its road, a mortgage of its road and franchises, which also included the lands granted by Congress to the State and by the State to that company. The road commenced at Davenport, on the Missouri, and was constructed westwardly one hundred and thirty miles when the act of 1864 was passed. In 1866 the mortgage was foreclosed, and the Chicago, Rock Island, and Pacific Railroad Company, under sale at the foreclosure proceeding, and by subsequent consolidation, became the owner of the road, the franchises, and the lands of the former company.

The entire legal title, therefore, to their land had passed, for valuable consideration, to this company.

Did their construction of the road on the new line annul or defeat, without further action on the part of the United States, the title thus vested? It would have been competent for Congress to have made it a condition of the change of location, that the lands within the six-mile or the fifteen-mile limit of the old line, and not within the twenty-mile limit of the new line, should revert to the United States, so far as the title of the company was concerned. But it did not make any such condition. If no law had been passed authorizing the change of route, it is possible the government might have reclaimed these lands as forfeited by reason of the change, to which it had not consented. But Congress did consent to the change without any declaration affecting the title already vested in the company.

The second section of the act of 1864 provided for a grant of land on each side of the new location, and for lieu lands when those could not be found to an amount equal to that granted by the original act of 1856, and it extended the limit for selecting lieu lands to twenty instead of fifteen miles.

It is argued that the lands thus granted were intended as a substitute for those accruing to the company under the first location, and that the latter necessarily reverted to the grantor; that it was the policy of the government that the lands granted should be alongside of the road, and that those retained by the government should thereby be enhanced in value. We are not prepared to deny that if the railroad company had accepted or received lands under the act of 1864, and the case was unem-

barrassed by the rights of subsequent purchasers or mortgagees, the United States could, by a judicial proceeding, enforce the principle that an exchange of lands was intended.

But this would arise from no express language of the act of Congress, or agreement with the company, but as a just and proper inference from the whole transaction.

There is, however, no evidence that the company ever received any land under the act of 1864, or asserted a claim thereto. It appears affirmatively that it never filed in the General Land-Office a map of its new route until 1870, a year after the road was completed; and it is fair to presume that if it intended to assert a claim to land under the changed location, it would have filed its map when the change was made or determined on. We do not think the act can be construed to forfeit the lands to which they had title when they claimed none under the act of 1864.

Another point equally fatal to the plaintiffs in error is, that the assertion of a right by the United States to the lands in controversy was wholly a matter between the government and the railroad company, or its grantors. The legal title remains where it was placed before the act of 1864. If the government desires to be reinvested with it, it must be done by some judicial proceeding, or by some act of the government asserting its right. It does not lie in the mouth of every one who chooses to settle on these lands to set up a title which the government itself can only assert by some direct proceeding.

These plaintiffs had no right to stir up a litigation which the parties interested did not desire to be started. It might be otherwise if the legal title was in the government. Then the land would be subject to homestead or pre-emption rights. But the legal title is not in the government; and as we have already shown, the equity is more than doubtful. *Schulenberg v. Harriman,* 21 Wall. 44; *Tucker v. Ferguson,* 22 id. 527.

*Judgment affirmed.*

MR. JUSTICE BRADLEY dissented.