# SIOUX CITY & ST. PAUL RAILROAD COMPANY *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF IOWA.

No. 20.   Argued April 16, 17, 1895. — Decided October 21, 1895.

The Sioux City & St. Paul Railroad Company having failed to complete the entire road from Sioux City to the Minnesota line, as contemplated by the act of Congress of May 12, 1864, c. 84, 13 Stat. 72, making a grant of public land in aid of its construction, and as required by the statutes of Iowa, has not only received as many acres of public land as it could rightfully claim under that act, but has also received 2004.89 acres in excess of what it could rightfully claim.

Grants of odd-numbered sections of public lands to aid in the construction of railways imply no guaranty that each section shall consist of 640 acres, nor any obligation on the part of the United States to give other public lands to supply deficiencies in reaching that amount.

Under the said act of 1864, the grant was made to the State as trustee, and not to the railroad company, and the title under the patent, when issued, vested in the State as trustee.

When lands are granted by acts of Congress of the same date, or by the same act, to aid in the construction of two railroads that must necessarily intersect, or which are required to intersect, each grantee, when the maps of definite location are filed and accepted, takes, as of the date of the grant, an equal undivided moiety of the lands within the conflicting place limits, without regard to the time of the location of the respective lines.

THIS suit was brought by the United States against the Sioux City and St. Paul Railroad Company, pursuant to the act of Congress of March 3, 1887, providing for the adjustment of land grants in aid of the construction of railroads, and for the forfeiture of unearned lands theretofore granted. 24 Stat. 556, c. 376.

Upon its appearing that from any cause lands had been erroneously certified or patented to or for the use and benefit of any company to aid in the construction of a railroad, it became the duty of the Secretary of the Interior to demand the relinquishment or reconveyance of such lands, whether within granted or indemnity limits. If the company failed

for ninety days to comply with that demand, it was made the duty of the Attorney General to institute proceedings for the cancellation of the patents, certifications, or other evidence of title issued for such lands, and for the restoration of the title to the United States.  § 2.

The decree from which the present appeal was taken quieted the title of the United States, as against the Sioux City and St. Paul Railroad Company, and Elias F. Drake and Amherst H. Wilder, trustees in mortgages given by that company, to certain tracts of lands in Dickinson County, Iowa, alleged to contain 800 acres, and to other tracts in O'Brien County, in the same State, alleged to contain 21,179.85 acres; in all, 21,979.85 acres. *United States* v. *Sioux City & St. Paul Railroad*, 43 Fed. Rep. 617.

The railroad company claimed title under an act of Congress, approved May 12, 1864, c. 84, granting lands to Iowa in aid of the construction of railroads in that State, 13 Stat. 72, and also under statutes of Iowa passed in execution of the objects of that act.

The United States claimed that the company had received a larger quantity of lands than it was entitled to receive under the act of 1864, and, therefore, could have no claim to the particular lands here in controversy.

The relation of the parties to these lands and the facts upon which the question of title depended was shown by the following summary of the evidence :

By the above act of May 12, 1864, Congress granted lands to the State of Iowa to aid in the construction of two railroads in that State ; one, from Sioux City to the south line of Minnesota, at such point as the State of Iowa might select between the Big Sioux River and the west fork of the Des Moines River; the other, for the use and benefit of the McGregor Western Railroad Company, an Iowa corporation, to aid in the construction of a railroad extending from South McGregor, Iowa, in a westerly direction, by the most practicable route on or near the forty-third parallel of north latitude, until it intersected, in the county of O'Brien, the proposed road from Sioux City to the Minnesota state line.

The grant was of every alternate section, designated by odd numbers.   But if it appeared, at the date of definite location, that the United States had sold any granted section or part thereof, or that any preëmption or homestead right had attached thereto, or that the same had been reserved by the United States for any purpose whatever, the Secretary of the Interior was to select, or cause to be selected, for the purposes stated in the act, from the public lands nearest to the tiers of sections specified, so much, in alternate sections or parts of sections, designated by odd numbers, as was equal to the lands lost to the State in either of the modes just stated.   The lands thus selected were to be held by the State for the above uses and purposes, and were not, in any case, to be located more than twenty miles from the lines of the road to be constructed. All lands, previously reserved to the United States by any act of Congress, or in any other manner by competent authority for the purpose of aiding in any work of internal improvement or other purpose, were expressly reserved and excepted from the operation of the act, except so far as it was found necessary to locate the routes of the roads through such reserved lands.   § 1.

The lands granted were "subject to the disposal of the legislature of Iowa for the purposes aforesaid, and no other;" and the railroad was to be and remain a public highway for the use of the government of the United States, free of toll or other charge upon the transportation of the property or troops of the United States, as well as for the transportation of the mail at such price as Congress should fix.   §§ 3, 6.

The fourth section of the act was the subject of much discussion by counsel.   It provided: "That the lands hereby granted shall be disposed of by said State, for the purposes aforesaid only, and *in manner* following, namely: *When* the governor of said State shall certify to the Secretary of the Interior that any section of ten consecutive miles of either of said roads is completed in a good, substantial, and workmanlike manner as a first-class railroad, *then* the Secretary of the Interior shall issue to the State patents for one hundred sections of land for the benefit of the road having completed the

ten consecutive miles as aforesaid. *When* the governor of said State shall certify that another section of ten consecutive miles shall have been completed as aforesaid, *then* the Secretary of the Interior shall issue patents to said State in like manner, for a like number; and *when* certificates of the completion of additional sections of ten consecutive miles of either of said roads are, from time to time, made as aforesaid, additional sections of lands shall be patented as aforesaid, *until* said roads or either of them *are completed, when* the whole of the lands hereby granted shall be patented to the State for the uses aforesaid and none other: . . . *Provided further,* That if the said roads are not completed within ten years from their several acceptance of this grant, the said lands hereby granted and not patented shall revert to the State of Iowa for the purpose of securing the completion of the said roads within such time, not to exceed five years, and upon such terms as the State shall determine: *And provided further,* That said lands shall not in any manner be disposed of or incumbered, except as the same are patented under the provisions of this act; and should the State fail to complete said roads within five years after the ten years aforesaid, then the said lands undisposed of as aforesaid shall revert to the United States."

The lands embraced by the act were to be withdrawn from market as soon as the governor of the State filed, or caused to be filed, with the Secretary of the Interior, maps designating the routes of the respective roads. § 5.

The last section of the act granted to the State of Minnesota four additional alternate sections of land per mile — to be selected under the conditions, restrictions, and limitations contained in a former act of Congress, approved March 3, 1857, c. 99, 11 Stat. 195 — for the purpose of aiding the construction of a railroad in that State, extending from St. Paul and St. Anthony, by way of Minneapolis, to a convenient point of junction west of the Mississippi, in the southern boundary of the State, and in the direction of the mouth of the Big Sioux River. § 7.

By an act approved April 3, 1866, Iowa accepted the lands, powers, and privileges conferred upon it by the act of May 12,

1864; and, so much of the lands, interests, rights, powers, and privileges as were or could be granted and conferred in pursuance of the act of Congress, for the purpose of aiding the construction of the railroad from Sioux City to the Minnesota line, were disposed of, granted, and conferred upon the Sioux City and St. Paul Railroad Company, an Iowa corporation, to be hereafter called, for the sake of brevity, the Sioux City company. That act authorized the company to select and designate the point upon the south line of Minnesota to which its road should be built. Laws of Iowa, 1866, 143, c. 134, §§ 1, 2, 7.

By a subsequent statute of Iowa, approved April 20, 1866, it was provided that the lands, powers, duties, and trusts conferred by the act of Congress of "July 12, 1864," were accepted by the State upon the terms, conditions, and restrictions therein contained, and that "whenever any lands shall be patented to the State of Iowa, in accordance with the provisions of said act of Congress, said land shall be held by the State in trust for the benefit of the railroad company entitled to the same by virtue of said act of Congress, and to be deeded to said railroad company as shall be ordered by the legislature of the State of Iowa." Laws of Iowa, 1866, 189, c. 144. The word "July" in that act, inserted by mistake, was stricken out by an act passed March 24, 1868, and "May" substituted, and the acceptance intended to be made by the act of April 20, 1866, was ratified and confirmed. Laws of Iowa, 1868, 49, c. 42.

On the 17th of July, 1867, the Sioux City company filed in the General Land Office a map showing the location of its route from Sioux City, Iowa, northwardly to the south line of Minnesota, a distance of 83.52 miles. This map was accepted by the Interior Department, and, August 26, 1867, the odd-numbered sections within the ten and twenty-mile limits of the located line were withdrawn from the market.

The company — commencing, not at Sioux City, as was apparently contemplated by Congress and indicated by the map of definite location, but at the Minnesota line — began the construction of its road in 1872, and completed it south-

wardly in the direction of Sioux City, but only as far as Le Mars, in Plymouth County, a distance of 56.13 miles. No road was ever constructed by that company between Le Mars and Sioux City, a distance of about 25 miles, although it did construct, in 1872, within the corporate limits of Sioux City, about two miles of track, and erected there machine shops, depots, and round-houses of the value of $125,000, of which $30,000 were the proceeds of a special tax levied and collected by that city under a statute of the State.

In conformity with the act of 1864 the governor of Iowa certified, July 26, 1872, to the completion, in a good, substantial, and workmanlike manner, as a first-class railroad, of two sections of ten consecutive miles each, or twenty miles; August 10, 1872, of one section or ten miles; February 4, 1873, two other sections or twenty miles; in all fifty miles or five sections of ten consecutive miles each.

The Secretary of the Interior, as has been seen, was authorized by the fourth section of the act of 1864 to issue patents for one hundred sections of land as each section of ten consecutive miles was certified by the governor of the State to have been properly completed. Nevertheless, he issued to the State in the name of the United States for the use and benefit of the Sioux City company patents for 191,464.04 acres, October 16, 1872; 205,374.76 acres, June 17, 1873; 10,911.41 acres, January 25, 1875; and 160 acres June 4, 1877 — in all, 407,910.21 acres. As one tract of 40 acres was patented twice, the real amount patented to the State was 407,870.21 acres.

If each odd-numbered section for ten sections in width on each side of the road, within the terminal limits of the fifty miles of road certified as completed, had contained the full complement of 640 acres, the utmost quantity which the Secretary of the Interior was authorized to patent to the State on account of that fifty miles of road would have been 320,000 acres.

Of the 407,870.21 acres of land patented to the State, 322,412.81 acres were conveyed by the State to this company, the State retaining within its control the title to the balance, namely, 85,457.40 acres.

The legislature of Iowa by an act of March 13, 1874, directed the governor to certify to the Sioux City company, in accordance with the provisions of the act of April 20, 1866, any and all lands then held in trust for its benefit. That act, however, only required the conveyance of such of the trust lands, held by the State, as the company was entitled to by virtue of the act of Congress. For this reason, it is suggested, the governor did not convey the 85,457.40 acres that remained after conveying to the company the 322,412.81 acres of the 407,870.21 acres.

It was stipulated by the parties that the State had never conveyed to the Sioux City company the lands in Dickinson and O'Brien Counties which are here in dispute and claimed by the United States.

In 1878 the Chicago, Milwaukee and St. Paul Railway Company, to be hereafter referred to as the Milwaukee company, having succeeded to the rights of the McGregor Western Railroad Company, the other corporation named in the act of 1864, completed the construction of the McGregor railroad to a point of intersection with the line of the Sioux City road at Sheldon, a town in Iowa between Le Mars and the Minnesota line. And in 1879 the Milwaukee company instituted a suit in the Circuit Court of the United States for the District of Iowa against the Sioux City company and others for a decree determining the respective rights of itself and the Sioux City company in the lands at and near the point of intersection, where the grants for the road from Sioux City to the Minnesota line and the grant to the McGregor company necessarily came in conflict. That case came to this court upon the appeal of the Sioux City company, and it was here adjudged: 1. That the odd sections within the ten-mile limits of the Sioux City road, and not within the ten-mile limits although within the twenty-mile limits of the Milwaukee road, belonged exclusively to the Sioux City company. 2. That like sections within the ten-mile limits of the Milwaukee road, and not within the ten-mile limits although within the twenty-mile limits of the Sioux City road, belonged exclusively to the Milwaukee company. 3. That the lands

within the ten-mile limits of both roads belonged to the companies in equal undivided moieties.  4. That the lands within the twenty-mile or indemnity limits of both roads, and not within the ten-mile or absolute grant limits of either road, the title to none of which could accrue until selection was made for one road or the other, should, in view of the situation in which the title had been placed by the action of Federal and state officers, be equally divided between the companies. *Sioux City & St. Paul Railroad* v. *Chicago, Milwaukee & St. Paul Railway,* 117 U. S. 406.

The principles of this decision were carried into a decree of partition in the Circuit Court. From that decree it appears that of the 322,418.81 acres conveyed by the State, under the act of May 12, 1864, to the Sioux City company, there remained to that corporation 280,725.29 acres, after deducting the lands set apart to the Milwaukee company.

It is necessary now to refer to certain facts in relation to the line of road which the Sioux City company located, but never constructed, between Sioux City and Le Mars.

By an act of Congress, approved May 15, 1856 — more than eight years before the grant in aid of the construction of the road from Sioux City to the Minnesota line — a grant of lands was made to the State of Iowa to aid in the construction of a railroad from Dubuque to a point on the Missouri River at or near Sioux City.  11 Stat. 9, c. 28.  This grant was accepted by an act of the Iowa legislature approved July 14, 1856, and the lands were granted and conferred upon the Dubuque and Pacific Railroad Company, which located its line or route and filed its map of definite location with the Secretary of the Interior.  Laws of Iowa, 1856, Special Session, 1, c. 1. And, in 1870, that road was completed from Le Mars southwardly to Sioux City by the Iowa Falls and Sioux City Railroad Company, the successor of the Dubuque and Pacific Railroad Company.

In the year 1879 the Sioux City company conveyed to the St. Paul and Sioux City Railroad Company, a Minnesota corporation, its roadbed, rolling stock, depots, depot grounds, and other property and franchises in connection with its railroad:

and the latter company in 1881 sold and conveyed the same property and franchises to the Chicago, St. Paul, Minneapolis and Omaha Railroad Company, which still owns and operates the road constructed by the Sioux City company north of Le Mars. The last-named company has remaining no other property or assets, except such land as may inure to it under the grant of Congress of May 12, 1864, out of the lands patented to the State but not conveyed to that corporation, all of which are pledged, so far as that could be legally done, to secure the debts specified in the mortgages in which Drake and Wilder were trustees. One of those mortgages was executed August 26, 1871; the other February 5, 1884. The original debts secured by the mortgages aggregated $2,800,000, all of which has been paid off by sales of lands, except $660,000.

The preamble of an act of the legislature of Iowa, approved March 16, 1882, referred to the act of May 12, 1864, providing that if the road from Sioux City to the Minnesota line was not completed within ten years from the acceptance of the grant, the lands granted and not patented should revert to the State for the purpose of securing the completion of the road, and also to the statute of Iowa of April 3, 1866; and after reciting the failure of the Sioux City company to complete, or cause to be completed, any road on the line adopted therefor from Sioux City to Le Mars or any road in lieu thereof, it was declared "that all lands, and all rights to lands, granted or intended to be granted to the Sioux City and St. Paul Railroad Company by said acts of Congress and of the general assembly of the State of Iowa, which have not been earned by said railroad company by a compliance with the conditions of said grant, be and the same are hereby absolutely and entirely resumed by the State of Iowa, and that the same be and are absolutely vested in said State as if the same had never been granted to said railroad company." Laws of Iowa, 1882, 102, c. 107.

On the 27th day of March, 1884, the State passed another act, by the first section of which it relinquished and conveyed to the United States all lands and rights to land resumed and intended to be resumed by the above act of March 16, 1882, § 1.

By the second section of that act the governor was directed to certify to the Secretary of the Interior all lands not theretofore patented to the State to aid in the construction of the Sioux City road, the lands so certified to be deemed those above relinquished and conveyed to the United States by the first section, "provided, that nothing in this section contained shall be construed to apply to lands situated in the counties of Dickinson and O'Brien." Laws of Iowa, 1884, 78, c. 71.

Pursuant to the latter act the governor, on the 12th day of January, 1887, relinquished and conveyed to the United States 26,017.33 acres of the 85,457.40 acres of land which, as already stated, had been patented to the State for the benefit of the Sioux City company, but which were never certified to that company. Those lands are in Plymouth and Woodbury Counties, and do not embrace the lands in dispute.

The Sioux City road was so constructed as to form a continuous line with the railroad of the St. Paul and Sioux City Railroad Company, a Minnesota corporation, to aid in the construction of which from St. Paul and St. Anthony to the southern boundary of that State Congress made the grant of March 3, 1857. The latter is the road referred to in the seventh section of the act of May 12, 1864. Upon the construction by the Sioux City company of the road from the Minnesota line to Le Mars, that corporation obtained by lease the right to run and operate its cars over the road of the Iowa Falls and Sioux City railroad extending from Le Mars to Sioux City, (and now operated by the Illiniois Central Railroad Company,) from which time the Iowa and Minnesota corporations and their grantees have continued to run and operate their roads as one continuous line from St. Paul to Sioux City.

Part of the lands in controversy here were entered upon by different persons between 1882 and 1885, claiming under the homestead and preëmption laws of the United States, and making formal applications to enter such lands. Their applications were rejected, but they appealed from those decisions, continuing to improve and cultivate the lands under their claims, and, in some instances, making valuable improvements.

And before the bringing of this suit the Sioux City company had commenced actions in ejectment in one of the state courts against the parties in possession.

In 1887 application was made to the Secretary of the Interior on behalf of certain persons, in O'Brien County, who had settled on the lands in controversy, as well as on lands referred to in the above partition decree, requesting suit to be brought by the United States to assert its title to said lands. After argument before the Secretary by counsel severally representing the settlers as well as the Sioux City and Milwaukee companies, that officer — Secretary Lamar — rendered an elaborate opinion, in which the whole subject was reviewed. 6 Land Dec. 50, 62.

*Mr. George B. Young,* (with whom was *Mr. J. H. Swan* on the brief,) for appellants.

*Mr. Assistant Attorney General Dickinson* for appellees.

*Mr. William L. Joy,* for settlers, filed a brief on behalf of the United States.

*Mr. William Lawrence,* representing settlers on the lands in controversy, filed a brief for the United States.

Mr. Justice Harlan, after stating the case as above re-reported, delivered the opinion of the court.

1. The lands now in dispute are part of the 85,457.40 acres patented by the United States to Iowa for the use and benefit of the Sioux City company, but never conveyed by the State to that company.

If the company has received as much of the public lands as it was entitled to have on account of constructed road, may not the lands in dispute — the time limited by Congress for the completion of the entire road having passed — be regarded as "undisposed of" within the meaning of section four of the act of 1864, and may they not, therefore, be claimed by the government as belonging to the United States? According to that section, if the two roads named

in it were not completed within ten years from the several
acceptances of the grant, the lands granted and not pat-
ented were to revert to the State "for the purpose of
securing the completion of the said roads within such time,
not to exceed five years, and upon such terms as the State
shall determine." And the second proviso was to the effect
that said lands should not in any manner be disposed of or
incumbered, except as the same were patented under the pro-
visions of the act; "and should the State fail to complete said
roads within five years after the ten years aforesaid, then the
said lands undisposed of as aforesaid shall revert to the United
States."

If the terms of an act of Congress, granting public lands,
"admit of different meanings, one of extension and the other
of limitation, they must be accepted in a sense favorable to the
grantor. And if rights claimed under the government be set
up against it, they must be so clearly defined that there can
be no question of the purpose of Congress to confer them."
*Leavenworth &c. Railroad* v. *United States*, 92 U. S. 733, 740.
Acts of this character must receive such construction "as will
carry out the intent of Congress, however difficult it might be
to give full effect to the language used if the grants were by
instruments of private conveyance." *Winona & St. Peter
Railroad* v. *Barney*, 113 U. S. 618, 625. "Nothing is better
settled," this court has said, "than that statutes should receive
a sensible construction, such as will effectuate the legislative
intention, and, if possible, so as to avoid an unjust or an absurd
conclusion." *Lau Ow Bew* v. *United States*, 144 U. S. 47, 59.

Giving effect to these rules of statutory interpretation, we
cannot suppose that Congress intended that the railroad com-
pany should have the benefit of more lands than it earned.
As the lands granted could only be devoted to the construc-
tion of the Sioux City road from Sioux City to the Minnesota
line, and as the State, holding the legal title in trust, has not
disposed of and does not intend to dispose of them for the
purpose of completing that part of the road located between
Sioux City and Le Mars, we perceive no sound reason why,
within the meaning of the act of 1864, these lands may not

be regarded as "undisposed of," and equitably the property of the United States, if it be true that the railroad company has received as much of the public lands as it was entitled to have on account of constructed road certified by the governor of the State.   This was the interpretation placed by the State upon the act of Congress; for, by the act of the Iowa legislature of March 16, 1882, the State, because of the failure of the Sioux City company to construct any road between Sioux City and Le Mars, resumed the title to all lands that had not been "earned" by the railroad company; and by the subsequent statute of March 27, 1884, it relinquished and conveyed to the United States all lands and rights of land resumed and intended to be resumed by a previous act.

It is apparent, therefore, that the fundamental question in the case is, whether the Sioux City company, having failed to complete the entire road from Sioux City to the Minnesota line, has received as many acres of the public lands as it could rightfully claim under the act of 1864?   If this question be answered in the affirmative, the company cannot complain of the final decree as one to the prejudice of its substantial rights.   Before considering this question it is necessary to examine certain propositions relating to the quantity of lands to which the Sioux City company was entitled for constructed road.

2.  On behalf of the company it is contended that in ascertaining the extent of the grant, we must assume that *each* odd-numbered section in the place limits contained its full complement of six hundred and forty acres, and that if any section contained, in fact, less than that quantity, the United States was under a legal obligation to make good the difference.   Clearly, the act of 1864 does not admit of this construction.   The record shows that many sections in the granted limits, as surveyed and marked, contained less than 640 acres.   The grant was of the odd-numbered sections for ten sections in width on each side of the road, whether they contained six hundred and forty acres, or more or less than that quantity.   The United States did not undertake that the granted sections should contain any given number of acres.

If it appeared, at the time the line of the road was located, that the United States had sold or reserved any particular section, the selection from the public lands, nearest to the tiers of the granted sections, to supply that loss, was limited by the act to the quantity of lands actually in the section so sold or reserved. The court below well said that there was no guaranty by the United States that the quantity of land covered by the grant should equal any fixed number of acres either for the construction of the entire road or any portion thereof, and that the exceptions named in the act clearly show that the company undertaking the construction of the line of the proposed railway was to get only the quantity of land that was ultimately found to be, in fact, covered by the grant.

3. The company, also, contends that it was entitled to lands for the whole number of miles of road actually constructed by it; that is, for the fifty miles certified by the governor to have been completed, and, also, for the fraction of six miles and a quarter immediately north of Le Mars, which was never certified to the Secretary of the Interior. We cannot assent to this construction of the act of Congress. Congress evidently had in view the construction of an entire road from Sioux City to the Minnesota state line. And to that end, the first section of the act of 1864 grants to the State every alternate section of land designated by odd numbers for ten sections in width on each side of the road. But that section must be taken in connection with the fourth section prescribing the mode in which the grant shall be administered. By the latter section, it is provided that the State shall not dispose of the lands granted, except for the purposes indicated by Congress *and in the manner* prescribed; further, that "said lands shall not in any manner be disposed of or incumbered, except as the same are patented under the provisions of this act." Now, the manner prescribed for disposing of the lands granted was, that patents should be issued to the State for one hundred sections of land for each section of ten consecutive miles, *when* the governor certified to the completion of such section in good, substantial, and workman-

like manner as a first-class railroad. This was evidently the interpretation given by the State to the act of Congress, for the governor never certified to the construction of any section of road less than ten consecutive miles in length.

It does not follow from this interpretation of the act that the company could never get lands for a fractional part of constructed road, less than ten consecutive miles. Provision was made for such cases by the clause directing patents to be issued to the State, as each section of ten consecutive miles was constructed, and was properly certified by the governor, "*until* said roads, or either of them, are *completed, when* the *whole* of the lands hereby granted shall be patented to the State for the uses aforesaid and none other." In other words, for a completed road, the State should have the full quantity of lands granted and found in odd-numbered sections, with the right to select other lands to supply any losses in either of the modes specified in the act of Congress. But the time never came when the State could rightfully demand patents for the whole of the lands granted. The road was never completed, and, therefore, patents could not be legally issued, except for one hundred sections of land for each section of ten consecutive miles of road, certified by the governor of the State to have been constructed in the mode required by Congress. The result of this view is, that the Secretary of the Interior was without authority to issue patents, except for the five sections of ten consecutive miles each, that is, for fifty miles of constructed road certified by the governor of the State. The State could not, without completing the road, or causing it to be completed, demand patents on account of the construction of less than a section of ten consecutive miles. This was the view taken by Secretary Lamar, who said that "a careful consideration of the granting act convinces me that there is no authority of law for patenting any lands on account of the six and a quarter miles of road, [immediately north of Le Mars,] and that no lands have been earned by the construction thereof." 6 Land Dec. 51.

4. Another contention is, that upon the issuing of the patents of 1872 and 1873 to the State for the use and benefit

of the railroad company the title vested absolutely in the company, and the lands were thereby freed from restraints of alienation, from conditions subsequent, or from liability to forfeiture. In support of this contention reference is made to *Bybee* v. *Oregon & California Railroad,* 139 U. S. 663, 674, 676–7; *Van Wyck* v. *Knevals,* 106 U. S. 360; *Wisconsin Central Railroad* v. *Price County,* 133 U. S. 496; *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241; *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1, 6. But these are cases, as an examination of them will show, in which the grant was directly to the railroad company, or in which the act of Congress required that the patents for lands earned should be issued, not to the State for the benefit of the railroad company, but directly to the company itself. In the case now before us, the statute directed patents to be issued to the State for the benefit of the company. So that, until the State disposed of the lands, the title was in it, as trustee, and not in the railroad company. *Schulenberg* v. *Harriman,* 12 Wall. 44, 59; *Lake Superior Ship Canal &c. Co.* v. *Cunningham,* 155 U. S. 372. See also *McGregor &c. Railroad* v. *Brown,* 39 Iowa, 655; *Sioux City & St. Paul Railroad* v. *Osceola County,* 43 Iowa, 318, 321. In the case last named, the Sioux City company was relieved from the payment of taxes upon some of the lands patented to the State for its benefit, upon the ground that the legal title was in the State, and the lands for that reason were not taxable. The question is altogether different from what it would be if patents for these lands had been issued, or if the State had conveyed them directly, to that company.

5. The company, also, contends that any calculation of the quantity of lands that the railroad company was entitled to receive, on account of constructed road, duly certified, must be on the basis, that it was entitled to lands, in lieu of those awarded to the Milwaukee company in the common place limits of the two intersecting roads. In this interpretation of the statute we cannot concur.

The rule is well settled that when lands are granted by acts of Congress of the same date, or by the same act, to aid in the

construction of two railroads that must necessarily intersect, or which are required to intersect, each grantee — the map of definite location having been filed and accepted — takes, as of the date of the grant, an equal undivided moiety of the lands within the conflicting place limits, without regard to the time of the location of the respective lines. *Sioux City &c. Railroad* v. *Chicago, Milwaukee &c. Railway*, 117 U. S. 406, 408; *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720, 727; *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway*, 97 U. S. 491, 501; *Cedar Rapids &c. Railroad* v. *Herring*, 110 U. S. 27; *Grinnell* v. *Railroad Co.*, 103 U. S. 739. In *Donahue* v. *Lake Superior Canal &c.*, 155 U. S. 386, 387, this court said: "The rule is that where two lines of road are aided by land grants made by the same act, and the lines of those roads cross or intersect, the lands within the 'place' limits of both, at the crossing or intersection, do not pass to either company in preference to the other, no matter which line may be first located or road built, but pass in equal undivided moieties to each."

The grants for the Sioux City and Milwaukee roads were by the same act. Of the granted sections in place limits common to both roads, each company, having filed its map of definite location, took, as of the date of the grant, an equal undivided moiety — no more. The equal undivided moiety granted for one road was not granted, nor could it be used, for the other road. Congress knew, when it passed the act of 1864, that there would be an overlapping of place limits at the required point of intersection of the two roads. And the Sioux City company when it accepted the benefit of the grant knew that such must be the case. As the act did not provide for a selection of lands for either road, on account of the undivided moiety of place lands granted for the other, we may not assume that the right to such selection was intended to be reserved. Lands lost to the Sioux City company in one of the modes named in the act of Congress, and for which other lands could be selected, were lands granted for that company, not lands granted to another company for a different road. The lands which the Sioux City company claims to have so lost —

namely, the undivided moïety granted, and subsequently awarded, to the Milwaukee company out of the common place limits — were never granted for the Sioux City road, but were granted for the McGregor or Milwaukee company.

This question was examined in 1887 with great care by Secretary Lamar. The claim was made before him by the Sioux City and the Milwaukee companies that each was entitled to indemnity for the lands which it claimed to have lost by reason of the grant for the other company of an equal undivided moiety within the conflicting place limits. The Secretary said : "I am unable to conclude that such was the intention of Congress in making the grant. To say that it was would be to say in effect that, in so far as the ten-mile limits of the two grants overlap, the purpose of the granting act was to make what would amount to a double grant. Each company got a moiety of the lands in odd-numbered sections within the common granted limits. Now, should there be allowed to each company indemnity for the moiety lost by grant to the other, a quantity of land equivalent to all the odd and even-numbered sections in said common granted limits would be passed under the granting act. This, I think, could not be justified by any proper construction of the act, nor can I conceive it to have been intended by Congress. The grant was of a moiety for each road within the common granted limits of both roads. This accords with the view expressed by the Supreme Court in the case of *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720. Either this is true, or Congress by the same act twice granted the same lands. To say that it did, or intended to do, this, would be to say that it acted unreasonably, or without a proper understanding of what it was doing. Now, since indemnity is allowed only for lands granted and lost from the grant, and since in the common ten-mile limits of these two roads only a moiety was granted, it follows that neither company has any legal claim for indemnity on account of the moiety granted to the other." 6 Land Dec. 54, 62.

6. In the light of these principles we come to the practical question presented for determination, namely, whether the

Sioux City company, having failed to complete the road for the benefit of which the grant was made, has received as much of the public lands as it was entitled to receive under the act of 1864? This is entirely a matter of figures.

As heretofore shown, the State patented or certified to the railroad company 322,412.81 acres out of the 407,870.21 acres patented by the United States. We have seen that of the 322,412.81 acres so transferred to the company, 41,687.52 acres were taken from the Sioux City company and given to the Milwaukee company by the decree of the Circuit Court, pursuant to the mandate of this court in *Sioux City & St. Paul Railroad* v. *Chicago, Milwaukee & St. Paul Railway*, 117 U. S. 406. This, as has been stated, left the Sioux City company with title to 280,725.29 acres, which it has disposed of or sold, and about which no question is made in this case by the United States.

Was the company entitled to a larger quantity of lands on account of the fifty miles of road certified by the governor of Iowa to have been properly constructed?

We have said that the Sioux City company was only entitled to the sections as surveyed and as they appeared on the public records, whether they contained more or less than 640 acres each. Upon examination of the certified list. of lands, *based on the diagram originally furnished by the railroad company to the Secretary of the Interior* and transmitted by the General Land Office to the local land office on the 26th of August, 1867, it is found that the actual area of the odd-numbered sections within the place limits of the Sioux City road, *excluding* odd-numbered sections within the conflicting place limits of the two roads, contained only 247,476.85 acres; and the actual area within the conflicting place limits of the two roads, *according to the same diagram,* was 70,705.29 acres. Of the latter quantity one-half, or 35,352.64 acres, belonged to the Milwaukee company as its equal undivided moiety of the lands in the common place limits. Apparently, therefore, if this diagram be taken as a basis of calculation, the railroad company could have earned, on account of the fifty miles of constructed road, only 247,476.85 acres outside of the conflicting

place limits and 35,352.64 acres within such limits; in all, 282,829.49 acres, or 2104.21 acres more than the 280,725.29 acres actually received by it, and about which no question is here made by the government.

But there are exhibits in the case made part of the agreed statement of facts that lead us to a different result. In 1887 the Commissioner of the Land Office, having before him the question of how much of the public lands the Sioux City company was entitled to receive, caused an accurate measurement to be made of the area of the odd-numbered sections and parts of sections lying within the grant made by the act of May 12, 1864, for the construction of the Sioux City road. The record shows, if that measurement be regarded, that within the common place limits of the two roads there were only 69,825.99 acres, of which the Sioux City company was entitled to one-half, or 34,912.99 acres, and that outside of the conflicting limits, and within the place limits of the Sioux City road, there were only 243,807.41 acres. So that, on the basis of the measurement of 1887, the company could have earned for the fifty miles of certified road only 278,720.40 acres, that is, less, by 2004.89 acres, than it has actually received and holds or has sold.

The result is, that if the diagram furnished by the railroad company in 1867 be followed, the Sioux City company is entitled to 2104.22 acres in addition to what it has received; whereas, if the measurement of 1887, made under the direction of the Land Office, be accepted, that company has received 2004.89 acres more than should in any case have been awarded to it.

We are of opinion that the measurement of 1887 should be taken as the basis for determining the area of the odd-numbered sections within place limits. In the agreed statement of facts reference is made to a list, certified from the General Land Office, of the odd-numbered sections and parts of sections lying within the conflicting place limits of the Sioux City and Milwaukee roads, and it is agreed that that list is correct according to the limits laid down on the map of 1887, " and correctly shows the area of each of said tracts." In the agreed

statement of facts reference is also made to another list, certified from the General Land Office, and it is stated to be a correct list of the odd-numbered sections and parts of sections within the place limits of the Sioux City road outside of the conflicting limits, "and the areas thereof," as defined and certified on the map of 1887.

These lists were objected to by the railroad company as immaterial and irrelevant. But we do not perceive any good reason why they are not competent as evidence — as much so as the diagram of 1867 and the lists based upon it. Surely it was competent for the land office, when determining whether the Sioux City company was entitled to additional lands, to ascertain, by careful remeasurement, the exact area of the odd-numbered sections covered by the grant of 1864, and thus determine whether the map furnished by the railroad company in 1867 was, in all respects, accurate. By examining the maps of 1867 and 1887 it was easy to perceive in what particulars they differed; and, by proof, to show which was correct. But the defendant took no proof to discredit the map of 1887, and rests this part of the case upon the general proposition that, after the lapse of so many years, the court should base its decree on the map of 1867, which was accepted by the government and was not questioned until the measurement of 1887 was made by the General Land Office. This view is, of course, entitled to great weight, and might be accepted, if the determination of this question of evidence and the acceptance of the measurement of 1887 would affect the rights of third parties to specific lands. The matter to be ascertained is the number of acres in each one of certain sections, the exterior boundaries of which are not in dispute. Now, it would seem that, as between the United States and the railroad company, and for the purpose of ascertaining the quantity in acres of public lands which the company earned, or could have earned, on account of the construction of the fifty miles of road, the latest official measurement of the area of the granted limits, not charged to have been fraudulently made, may be accepted as the best, if not conclusive, evidence.

It is said that a contrary view was announced in *United*

*States* v. *Hancock*, 133 U. S. 193, 196. That was a suit to set aside a patent based upon a decree confirming a claim to certain lands within specified boundaries. The court, following previous decisions, held that " when a *decree* gives the boundaries of the tract to which the claim is confirmed, with precision, and *has become final by stipulation of the United States, and the withdrawal of their appeal therefrom,* it is conclusive, not only on the question of title, but also as to the boundaries which it specifies." That was a case in which the rights of third parties were involved, and it is scarcely necessary to say that nothing we have said is in conflict with the principle settled in it.

Our conclusion, then, is that the Sioux City company, having failed to complete the entire road, for the construction of which Congress made the grant in question, was not entitled to the whole of the lands granted, but, at most, only to one hundred odd-numbered sections — as those sections were surveyed, whatever their quantity — for each section of ten consecutive miles constructed *and certified by the governor of the State;* and, that, according to the measurement of 1887, which is accepted as the basis of calculation, the railroad company had, prior to the institution of this suit, received more lands, on account of the fifty miles of constructed road, certified by the governor, than it was entitled to receive. Under this view, it is unnecessary to inquire whether the particular lands here in dispute should not have been assigned to the company, rather than other lands, containing a like number of acres, that were, in fact, transferred to it, and which cannot now be recovered by the United States, by reason of their having been disposed of by the company. If the company has received as much, in quantity, as should have been awarded to it, a court of equity will not recognize its claim to more in whatever shape the claim is presented.

It is proper to say in this connection that the United States in its bill alleges that the excess of lands received by the company was 1288.13 acres. We have found the excess to be 2004.89 acres. The bill also states that the lands in Dickinson and O'Brien Counties, here in dispute, aggregate 21,979.85

acres, and so the decree below assumes. The amount appears to be 21,692.18 acres, and it was so stated by Secretary Lamar. 6 Land Dec. 63. But these differences are immaterial on the present appeal, for we adjudge that although the lands in dispute were patented to the State for the use and benefit of the Sioux City company, the latter is not entitled to any of them, whatever may be the aggregate quantity of acres. It is not claimed by the company that any of these lands constitute a part of those actually certified to by the State.

7. The last contention of the appellants is that the claim of the United States ought not to prevail against the trustees in the mortgages executed by the railroad company, and which constitute the only security for *bona fide* holders of bonds secured by those mortgages. The first of these mortgages was executed August 1, 1871, before any lands were patented to the State, and before the railroad company had commenced the construction of its road; the second, on the 25th day of February, 1884, long after the Iowa legislature — which had authority under the act of 1864 to dispose of lands not earned — had declared the resumption by the State of the title to all lands patented to the State under the act of Congress, and not earned, and more than fifteen years after the railroad company accepted the act of the State that conferred upon it the benefits of the grant.

In reference to this claim by the trustees in those mortgages — assuming that they properly represent, in this matter, the holders of bonds — it is sufficient to say that the Secretary of the Interior was without authority to issue any patents to the State for the use and benefit of the railroad company, except for the fifty miles of road, certified by the governor to have been constructed in the manner required by the act of Congress. The trustees, and all holders of bonds secured by the mortgages, were bound to know the extent of the Secretary's authority under the act of Congress. The utmost that the trustees could claim is that the mortgages covered one hundred sections for each ten consecutive miles of road certified by the governor of the State to have been properly constructed. Lands to that extent have been received by the

company. The 85,457.40 acres of which the lands in dispute were part, and which remained with the State after transferring to the company 322,412.81 acres of the 407,870.21 acres patented to the State for the use of the company, were not, and could not legally have been, covered by the mortgages.

Upon the grounds stated in this opinion, we adjudge that the decree below did not prejudice any right of the appellants, or of either of them, and it is, therefore,

*Affirmed.*