Camubeue, Chief Justice,
reviewing the facts found to be established, delivered the opinion of the court.
The controlling question for decision is whether plaintiff’s road from Port Huron to Flint was land-aided within the meaning of the act of 1856. Congress granted to the State of Michigan, and the latter duly accepted, the grant of certain. lands “.to aid in the construction of ” certain railroads, one of which was described generally as “ from Grand leaven and Pere Marquette to Flint and thence to Port Huron.” Two railroad companies were designated to receive the lands pertaining to the route “ from Grand Haven to Flint and thence to Port Huron ’’ — namely, the Detroit & Milwaukee Pailway Company and the Port Huron & Milwaukee Pailway Company, the first named to have the lands attaching to the route from Grand Haven to Owosso, and the Port Huron & Milwaukee Company to have the lands pertaining to the route from Owosso to Flint and thence to Port Huron. This last-named company filed a qualified acceptance of the act of the Michigan Legislature owing to a provision therein relative to taxation and a payment of tax on its gross earnings. The Board of Control of Pailroads *482 provided for in the act of the legislature subsequently annulled any grant to said company because of its said nonacceptance of the terms of the act.
Later, however, the railroad company filed its map or designation of definite location in the office of the Secretary of the Interior, and in 1864 there was certified by the Land Office a list 'of lands pertaining to the route from Port Huron to Flint. The Port Huron & Milwaukee Company acquired rights of way and did some work on its contemplated line, but its properties were later, sold under foreclosure proceedings. These finally came into the ownership of the Port Huron & Lake Michigan Railroad Company, which built the road from Port Huron to Flint, completing it and having it in operation on December 12, 1871. This company issued its bonds, secured by mortgage on the porperties it owned at the date of the mortgage and those it should thereafter acquire. Considerable sums of money were subscribed by individuals and by public bodies towards the construction of said line of road.
A few weeks before the actual completion of. the road from Port Huron to Flint — to wit, in November, 1871 — the officials and agents of the Port Huron & Lake Michigan Railroad Company applied to said Board of Control for the lands granted by the act of Congress and certified by the Secretary of the Interior as pertaining to the original route from Port Huron to Flint, and also for the hinds which had also been certified by the Secretary as pertaining to the contemplated route from Grand Haven to Owosp, there having been certified 6,428.68 acres for the Port Hurpn & Milwaukee Company, lying, with a small exception, between Port Huron to Flint, and 30,998.76 acres west ©f Flint for the Detroit & Milwaukee Company, or an aggregate of about 36,000 acres for the entire route, which, as\ has been stated, was divided between two companies, mak-\ ing Owosso the meeting point. The Board of Control en- \ tertained some doubt of its right to grant the lands of said road, but expressed the view that, if it could be lawfully done, the lands should be conveyed to said road as the party entitled to them. This action was taken by the board in *483 November, 1871, shortly before the road was in operation to Flint, and the matter apparently remained^in abeyance until May 1, 1873, at which time there was presented to said Board of- Control a petition by the Port Huron & Lake Michigan Eailroad Company, which recited said action of the board in November, 1871, “in the passage of a resolution declaring among other things in substance that the said Port Huron & Lake Michigan Eailroad Company was justly entitled to and ought to receive, to aid in the construction of their road, the lands granted by the act of Congress of June 3, 1856, to the State of Michigan to aid in the construction of a line of railroad from Grand Haven to Flint and thence to Port Huron, if the State had still the power to confer upon it such lands; ” and further recited that from documents filed with the petition “ it appears by the decision of the Commissioner of the General Land Office ” that the State of Michigan had the right to dispose of said lands for the purposes specified in the grant. The petition further stated that “ the said company having completed 66 miles of the unfinished portion of said line,” and being the only company applying for, “ are entitled to said lands within the purposes of the grant.” The prayer of the petition was that the lands be conferred on the petitioner with a proper recognition of the rights of any actual settlers on the same.
Before the date of this petition a line of road had been built from the westward through Owosso and thence to Detroit, but not from Owosso toward Flint. There was thus a gap between Owosso and Flint of some miles, they being in adjoining counties. The petition, in referring to the line from Grand Haven to Flint and thence to Port Huron, as originally contemplated in the act, speaks of the “ unfinished portion ” of that line, which evidently was from Owosso to Flint and thence to Port Huron, and of this “unfinished portion” the petitioner had built about 60 miles — namely, from Port Huron to Flint. The board of control passed resolutions reciting the history of the transactions involving the lands, designated the Port- Huron & Lake Michigan Eailroad Co. “ as the proper company to receive said grant,” *484 and directed tbe transfer of tlie lands to that company “ for the purpose of constructing and completing their said road.” The railroad company then applied to the governor of the State, who was ex officio president of the board of control, “ for due and proper evidence of title to said lands so granted to said company by said board of control,” and the governor, on May 80, 1873, issued a patent to said company, their successors and assigns, for said lands “ for the purpose of constructing, or aiding in constructing, and completing their said road,” subject, however, to a condition in favor of actual settlers and occupants upon certain of the lands. On the same day upon which the patent was issued the railroad company, through its president and secretary, acting under resolutions by its directors, duly accepted the grant and assented and agreed to “the provisions and requirements of the acts of the Legislature of the State of Michigan and the said act of Congress before referred to.” In July, 1873, the railroad company confirmed the action of a committee which its directors had created “ to take such measures as to them seemed best for the sale and disposition of the lands granted by Congress to the State of Michigan in aid of the construction of the line of railroad from Grand Haven to Flint, and thence to Port Huron, and by said State conveyed to said company,” the action of the committee having been the selection of one Bowes as agent or trustee to sell and convey the lands for the company and the conveyance to him of the lands in trust for said purposes.
It thus definitely appears that the Port Huron & Lake Michigan Bailroad Company applied for the lands, asserted its right to them, accepted the grant, and proceeded to exercise ownership and control of them. The lands so granted, it will be observed, included some 30,000 acres, most if not all of which were west of Owosso, and some 6,000 acres, all of which, except about 97 acres, were east of Flint. The latter lay on either side of the line from Port Huron to Flint and were scattered within the limits of the land grant in the several counties between said points. Some litigation having arisen between the trustee appointed by the railroad to handle and dispose of the lands for it and another claiming a part of. the lands, the case went to the Supreme Court of *485 Michigan. The land in question was west of Owosso, and the fundamental question in the case before the Supreme Court of Michigan was, as stated by that court (Bowes v. Haywood, 35 Mich., 241, 244), “ the right of the Port Huron & Lake Michigan Eailroad Company to receive the forfeited grant which had been made to the Detroit & Milwaukee Eail-road Company.” The court below, having found that there was no evidence, claim, or pretense that the Port Huron & Lake Michigan Eailroad Company contemplated building any road on the route from Grand Haven to Owosso, the Supreme Court said the question was “ whether the legislation of Congress and of the State would authorize the board of control to grant lands lying on the route from Grand Haven to Owosso for the construction of a road east of Owosso.” In an opinion by Judge Cooley it was held that the attempted grant of the lands west of Owosso to said company was void, and that the lands could not be granted to a road which was not contemplating a line from Grand Haven to Owosso. That case does not deal with the grant of the lands east of Flint.
In May, 1877, the Legislature of Michigan passed an act purporting to ratify and confirm the action of the board of control and the governor of May 1 and May 30, respectively, in granting said lands to the Port Huron & Lake Michigan Eailroad Company, and thereafter another case arose wherein the Supreme Court of Michigan (Fenn v. Kinsey, 45 Mich., 446) adhered to their ruling in Bowes v. Haywood, sufra, and held that said act of the legislature was not effective to give validity to said grant of lands west of Owosso. Stating that it did not appear in the case whether the fact of the construction of the 60 miles between Port Huron to Flint had been certified by the governor to the Secretary of the Interior, it was said to be unimportant “because that certificate would only cover lands belonging to the line east of Flint.” It does appear in the instant case that under date of April 13, 1874, the governor of Michigan certified to the Secretary of the Interior the completion of 60 miles of railroad between Port Huron and Flint by the Port Huron & Lake Michigan Eailroad Company. That 60 miles of road was substantially on the line of definite location filed by the Port Huron & Milwaukee Company in the year 1857 in the *486 General Land Office, and it was for the last-named company that the Secretary of the Interior, on November 1, 1864, certified to the governor of Michigan 6,428.68 acres, being the same lands subsequently conveyed, as has been stated, to the Port Huron & Lake Michigan Railroad Company by the board of control and governor of Michigan. All of said acreage, except about 97 acres, was east of Flint. The Port Huron & Lake Michigan Railroad Company acquired property rights of the Port Huron & Milwaukee Railway Company under foreclosure proceedings and mesne conveyances.
To continue the history further, it appears that in 1879 Congress, by joint resolution, released to the State of Michigan “ any and all reversionary interest which may remain in the United States in such of the lands granted by the act of June 3, 1856, as were granted to aid the construction of the road from Grand Haven to Flint and thence to Port Huron.” It was declared that “ this release shall not in any manner affect any legal or equitable rights in said lands which have been acquired, but all such rights shall be and remain unimpaired.” 20 Stat., 490. In 1881 the Legislature of Michigan passed an act confirming the action of the board of control and the governor taken in 1873 in conveying the lands east of Flint to the Port Huron & Lake Michigan Railroad Company, with a proviso that nothing in the act should impair or affect any valid right or interest theretofore acquired by any individual, corporation, or other party in said lands, or any part thereof. Any grants or conveyances which had been made by the Port Huron & Lake Michigan Railroad Company, or its officers or trustee, were likewise confirmed by said act. That act recited that the said company had constructed its road from Port Huron to Flint “ upon the line contemplated by the act of Congress granting said lands to the State of Michigan.”
The title and ownership of the plaintiff in the road from Port Huron to Flint was derived through mortgage foreclosures and consolidations of lines of railroad.
We can not escape the conclusion that the Port Huron & Lake Michigan Railroad Company acquired ownership of the lands east of Flint by the action of the board of control and the patent issued by the governor of Michigan, and *487 upon its application tlierefor under a claim of right to the lands. The fact that it applied for and there was an attempted conveyance to it of lands west of Flint, or west of Owosso, and that its claim to these lands was defeated, can not be accepted as sufficient reason for holding that the conveyance of lands east of Flint was illegal or in contravention of the act of Congress. It sought the conveyance and declared it was entitled to them under the congressional grant. It accepted the conveyance in terms and proceeded to exercise control and disposition of them. A trustee of its appointment was authorized to sell them and that trustee was subsequently made a party defendant in the mortgage proceedings under which the company’s properties were sold. It had sought the lands in right of having built about 60 miles of road along the contemplated line, and its acceptance of the conveyance of the lands pertaining to their “ unfinished portion ” of the line estops it to say the lands were not lawfully conveyed to it. We see nothing in the act of Congress or in the action of the Michigan Legislature that defeats the validity of the conveyance of these lands east of Flint. If there remained in Congress under the terms of the act of 1856 a condition subsequent, whereby they could have declared a forfeiture for any existing cause, that condition did not affect the title that was lawfully conveyed, and it was never exercised in any event.
The joint resolution by which Congress released any reversionary interest in the lands granted by the act of 1856 is broad enough to protect individuals and corporations alike who had lawfully acquired any of the lands. It was not the equivalent of a forfeiture by Congress of the lands for any of the causes contemplated by the act of 1856. The legal title to the lands had passed to the State of Michigan, and by her duly constituted authorities the title to the lands east of Flint was transferred to the railroad company in 1873. If anything further was needed to vest the title so conveyed, it was furnished by the act of the legislature of 1877. Only by judicial proceedings, properly asserted, could the Government interfere with the grant. Grinnell v. Railroad Co., 103 U. S., 739, 744. We think that the conveyance of the *488 lands east of Flint was valid and that the Government could not have questioned it. The joint resolution of 1879 did not do so. The attempted grant of lands west of Flint was, as we have seen, abortive. The act of 1856 contemplates that the lands should not be sold in advance of the building of the road in sections of at least 20 continuous miles. But the road had been built for 60 miles, and as to that portion the company could lawfully ask for and receive the lands pertaining to such portion. It could not, however, accept the benefits of these lands, granted by the Government for a specific purpose, and escape the burdens imposed by the act granting them. The lands were not imposed on the railroad company. It asked for them and solemnly accepted the grant as made under the provisions of the act of Congress and the legislature of the State. It does not lie in the mouth' of the railroad company to say that it only acquired about 6,400 acres out of approximately 36,000 acres asked for, that the consideration for its assumption of the burdens of the land-grant act was entire and indivisible, and that therefore it did not assume said burden.
Where the unlawful part of the grant is separable from the lawful part it can not be held that the company receiving and retaining the lawful part should be relieved from the effect of its contract, especially where the lands received and retained were all the lands pertaining to the line of road actually completed. The company must be held to have known that it could not receive the lands west of Owosso or of Flint under a statement that it had built the road to Flint, and with a pretext that it would build to Owosso, which it never did. It would not be heard to plead its own wrong in order to escape a legal liability self-imposed. We therefore hold that the road from Port Huron to Flint was land aided.
The next question is whether the plaintiff’s compensation was subject to the deduction made by the Postmaster General in 1912.
There was a postal route from Port Huron to Flint as early as 1872. When the plaintiff acquired that portion of road in 1900, it had never been treated as land aided, and not until after the plaintiff had carried the mails for 12 *489 years and been paid therefor the rates fixed in the Postmaster General’s readjustment orders was the question raised that the mails must be transported from Port Pluron to Flint at 80 per cent of the compensation awarded roads which were not land aided. Practically 40 years then intervened before the liability was sought to be enforced.
We do not think this case is ruled by the considerations referred to in Alabama Great Southern Railroad Company Case, 142 U. S., 615. It does not appear that there was any construction of a statute during said term of years which was changed by a construction of the same statute given in 1912. It was rather a mistake of fact than of law by which the' road was exempted. Nor does the inaction of the Post Office Department during the long period furnish any estoppel. The plaintiff was chargeable with notice of the character of the road it acquired as to its being land aided or not. In the chain of title to the properties of the Port Huron & Lake Michigan Railroad Company was the mortgage foreclosure and the fact that Bowes, the trustee to sell said lands, was made a party defendant, evidently to bring those lands under the decree of foreclosure. The public acts of the legislature referred to the lands and to the railroad company as well. The books and records of the company itself were probably open to plaintiff’s inspection. But whether it had actual notice or not of the condition, the fact is that said road was land aided, and the deduction that was made, it seems to us, was valid under the principles decided in Wisconsin Central Railroad Co. v. United States, 164 U. S., 190; 27 C. Cls., 440; Chicago, St. P. M. & O. R. R. Co. Case, 217 U. S., 180.
It does not affirmatively appear what the value of the 6,000 acres was. It does appear that under the terms of the grant to the railroad company it took the lands on the condition that actual settlers thereon should be required to pay $1.25 per acre. Upon this basis, if applied to all the land, their value would be less than $10,000. There was deducted from the plaintiff’s compensation over $50,000, representing 20 per cent of its compensation on the said route from 1900 to 1912. Since that time it has received 80 per cent of the compensation on the postal route from Port Huron to Flint, *490 which it would have received if treated as a nonland-aided road. With any supposed equities presented by the facts the court can not deal, but the plaintiff’s relief from the situation in which it finds itself can only be granted by Congress.
It follows that the petition should be dismissed. And it is so ordered.
Hay, J udge; Barney, Judge; and Booth, Judge, concur.
Downey, Judge, took no part in the decision of this case.