## MANLEY v. TOW et al.

(Circuit Court, N. D. Iowa, W. D. September 6, 1901.)

1. PUBLIC LANDS—JURISDICTION OF COURTS—CONCLUSIVENESS OF DECISION OF DEPARTMENT.

A court of equity has jurisdiction to grant appropriate relief to a complainant, who has been deprived of land to which he is entitled under the public land laws through an erroneous construction of the law by the land department as applied to the facts found, although as to the facts the findings of the department are conclusive.[1]

2. SAME—RAILROAD GRANT—REVERSION OF UNEARNED LANDS.

Act May 12, 1864 (13 Stat. 72), granting lands to the state of Iowa for the purpose of aiding in the construction of two lines of railroad, one of which was from Sioux City to the south line of the state of Minnesota, provided that the lands should be patented as earned by the construction of sections of the road, to be certified by the governor, and that, if the roads were not completed within 10 years of their several acceptances of the grant, the lands granted and not patented should revert to the state for the purpose of securing the completion of said roads within such time, not to exceed 5 years, and upon such terms as the state should determine: "provided, further, that, * * * should the state fail to complete the said roads within 5 years after the 10 years aforesaid, the said lands undisposed of as aforesaid shall revert to the United States." In 1866 the lands apportioned to the Sioux City Line were granted by the state to the Sioux City & St. Paul Railroad Company, which constructed a portion of the line, but ceased work in 1872. In 1882 the state declared the unearned portion of the grant forfeited, and resumed the same, but no action was thereafter taken by the state to secure the completion of the line. *Held*, that under the terms of the original grant by congress such unearned lands reverted to the United States, and became subject to Act March 3, 1887 (24 Stat. 556), providing for the forfeiture of unearned lands generally, and that the adverse claims of persons entering such lands under the public land laws and those claiming through purchase from the railroad company must be determined by the provisions of that act.

3. SAME—ACT CONFIRMING TITLE OF PURCHASERS—RIGHTS OF SUBSEQUENT PURCHASERS.

Act March 3, 1887 (24 Stat. 556), which declared a forfeiture of all unearned lands covered by railroad grants, and required their adjustment, but which provided in section 4 "that as to all lands * * * which have been sold by the grantee company to citizens of the United States the person or persons so purchasing in good faith * * * shall be entitled to the land so purchased," does not entitle one who purchased unearned lands from a company after the passage of the act to protection as against an actual settler under the homestead laws, whose settlement and improvement of the land antedated such purchase.

4. SAME—CONSTRUCTION OF GRANT—EFFECT OF PATENT TO STATE.

Act May 12, 1864 (13 Stat. 72), granted lands to the state of Iowa, as trustee, to secure the building of a line of railroad from Sioux City to the Minnesota state line, but expressly declared that the lands should be used for no other purpose, and should not be incumbered or disposed of until patented, and provided that they should only be patented as earned by the construction of coterminous sections of the road. *Held*, that a patent issued to the state for lands coterminous with a completed section of the road, but which had not been earned by reason of the failure of the company to complete the road, and which, for that reason, the state had refused to convey to the company, was limited by the con-

---

[1] Conclusiveness of decisions of land department, see notes to Hartman v. Warren, 22 C. C. A. 38, and Carson City Gold & Silver Min. Co. v. North Star Min. Co., 28 C. C. A. 344.

ditions of the grant, and did not operate as a conveyance "to or for the use of" the company, within the meaning of section 5 of Act March 3, 1887 (24 Stat. 556), and that under said section, in a contest between a purchaser from the company and a prior settler claiming under the homestead laws, preference should be given to the latter.

5. SAME—HOMESTEAD ENTRY OF UNEARNED LANDS—GOOD FAITH.
The good faith of a homestead settler is not impeached by the fact that the land, when he settled upon it, was within the limits of a railroad grant, under which it had been withdrawn from market, where he had knowledge that the terms of the grant had not been complied with, nor the land earned thereunder, and good reason to believe that it would soon be restored to the public domain, as in fact it was.

6. SAME—BONA FIDE PURCHASERS FROM RAILROAD COMPANY—NOTICE OF RIGHTS OF SETTLER
Under the provisions of Act·March 3, 1887 (24 Stat. 556), confirming the titles of bona fide purchasers of lands from a grantee railroad company whose title failed, or permitting such purchaser to enter the lands where the company had no title, a purchaser from a company is chargeable with notice of the rights of one who at the time of the purchase was in the actual occupancy of the land, claiming as a settler under the homestead laws, and he is not a bona fide purchaser, within the meaning of those provisions, as against such settler, but acquires only the title and rights of his grantor.

In Equity. On demurrer to bill. ·

J. H. King and M. B. Davis, for complainant.
W. P. Jewett, B. L. Wick, and Carr & Parker, for defendants.

SHIRAS, District Judge. This case, and a number of others now pending in this court, arise under the provisions of the act of congress of March 3, 1887 (24 Stat. 556), providing for the readjustment of land grants in aid of railways, and for the forfeiture of the unearned portions of such grants; the contest being between settlers on the land, claiming under the homestead laws of the United States, and purchasers from the Sioux City & St. Paul Railroad Company. The bill herein filed sets forth at length the acts of congress, of the general assembly of the state of Iowa, of the land department, and the decisions of the courts, state and federal, which affect the disposition of the land described in the bill, to wit, the N. W. ¼ of section 25, township 95 N., of range 41 W., situated in O'Brien county, Iowa. By the recitals in the bill it is shown that under date of May 12, 1864, congress passed an act granting to the state of Iowa, for the purpose of aiding in the construction of a line of railway from Sioux City to the south line of the state of Minnesota, every alternate odd-numbered section of land within 10 miles of the line of proposed road, with authority to the secretary of the interior to select indemnity lands from the odd-numbered sections within 20 miles of the line named. In the same act congress also granted to the state, for the benefit of the McGregor Western Railway Company, lands to aid in the construction of the line of railway from McGregor westerly. It is declared in the act (13 Stat. 72) that the lands granted shall be subject to the disposal of the legislature of Iowa for the purposes named in the bill, and for no other; it being further provided that the lands granted should be disposed of by the state in the manner following, namely:

"When the governor of the said state shall certify to the secretary of the interior that any section of ten consecutive miles of either of said roads is completed in a good, substantial and workmanlike manner as a first class railroad, then the secretary of the interior shall issue patents to the state in like manner for a like number, * * * and when certificates of the completion of additional sections of ten consecutive miles of either of said roads are, from time to time made as aforesaid, additional sections shall be patented, as aforesaid, until said roads, or either of them, are completed, when the whole of the lands hereby granted shall be patented to the state for the uses aforesaid and none other: * * * provided further, that if the said roads are not completed within ten years from their several acceptance of this grant, the said lands hereby granted and not patented shall revert to the state of Iowa for the purpose of securing the completion of the said roads within such time, not to exceed five years, and upon such terms as the state shall determine: and provided further, that said lands shall not in any manner be disposed of or incumbered, except as the same are patented under the provisions of this act, and should the state fail to complete the said roads within five years after the ten years aforesaid, that the said lands undisposed of as aforesaid shall revert to the United States."

By the provisions of the act of April 3, 1866, adopted by the general assembly of Iowa, the Sioux City & St. Paul Railroad Company was authorized to undertake the construction of the line from Sioux City to the Minnesota state line; and that company, beginning the construction at the state line, built the road to the town of Le Mars, in Plymouth county, but no further, ceasing the work of construction in 1872. By an act approved March 16, 1882, the general assembly of Iowa declared:

"That all lands, and all rights to lands, granted or intended to be granted to the Sioux City and St. Paul Railroad Company by said acts of congress, and of the general assembly of the state of Iowa, which have not been earned by said railroad company by a compliance with the conditions of said grant, be, and the same are hereby, absolutely and entirely resumed by the state of Iowa, and that the same be and are absolutely vested in said state as if the same had never been granted to said railroad company." Act 19th Gen. Assem. c. 107, § 1.

· By an act approved March 27, 1884, the general assembly enacted that all lands and rights to lands resumed by the act of 1882 were relinquished and conveyed to the United States, the governor of the state being directed to certify to the secretary of the interior all lands patented to the state, but which had not been patented to the Sioux City & St. Paul Company by the state; it being, however, provided "that nothing in this section contained shall be construed to apply to lands situated in the counties of Dickinson and O'Brien." The reason for this exception of the land in the named counties is to be found in the fact that the Chicago, Milwaukee & St. Paul Company had succeeded to the rights of the McGregor Western Company, the original beneficiary of the grant contained in the act of congress of May 12, 1864, in aid of the line from McGregor westerly, and as such successor had built the road up to and past the point of intersection with the Sioux City Line; and the Milwaukee Company was asserting a claim to the lands in O'Brien and Dickinson counties on the ground that it had not received the full amount of lands it had earned, and that, upon the failure of the Sioux City Company to earn the same, they would pass under the grant to the McGregor Western. It may be said, in passing, that this claim on part of the Milwaukee

Company was denied by the ruling of the supreme court in the case of Chicago, M. & St. P. Ry. Co. v. U. S., 159 U. S. 372, 16 Sup. Ct. 26, 40 L. Ed. 185, it being therein held that lands granted in aid of the line from Sioux City to the state line, but not earned by reason of the failure to construct the road between Le Mars and Sioux City, could not be claimed and held by the Milwaukee Company under the grant in aid of the line from McGregor westward. It may be further said that the rights of the companies in the lands within the overlapping limits of the grants at the place of intersection had been settled by the decision of the supreme court in the case of Sioux City & St. P. R. Co. v. Chicago, M. & St. P. R. Co., 117 U. S. 406, 6 Sup. Ct. 790, 29 L. Ed. 928, in pursuance of which a partition of lands had been made, and confirmed by a decree of the circuit court for the District of Iowa. In 1889 a bill was filed in this court by the United States against the Sioux City & St. Paul Company for the purpose of adjusting the land grant under the provisions of the act of congress of March 3, 1887, and the case was carried to the supreme court, it being finally held by that court that the railway company, through its failure to complete the entire line to Sioux City, had not become entitled to claim all the lands embraced within the grant, but only the proportionate share based upon its completion of five sections of the road; that the facts showed that there had been patented to it by the state more land than it was entitled to, and therefore the company was estopped from asserting any right or claim to the lands in O'Brien and Dickinson counties, which had been patented to the state, but had not been patented by the state to the company; thus, in effect, holding that these lands were unearned through the failure to complete the road, and, as such, they reverted to the United States under the terms of the original grant of 1864, as well as under the provisions of the act of 1887. The decision of the supreme court was under date of October 21, 1895. Sioux City & St. P. R. Co. v. U. S., 159 U. S. 349, 16 Sup. Ct. 17, 40 L. Ed. 177. The commissioner of the land office, by a letter dated November 18, 1895, called the attention of the register and receiver of the local office at Des Moines, Iowa, to the status of these lands, stating that the decision of the supreme court showed that the title thereof was in the United States, and the lands were subject to the disposal of the department, and to that end directed that a list of the lands be published, with notice that the same would be subject to entry on a day to be named, and that all persons making claims to any part thereof must give notice thereof, and make proof thereof, and in cases of conflicting claims the usual method of hearing the same would be followed. The complainant made claim to the land in dispute in this case under the provisions of the homestead law, setting forth her settlement on the land, the continued occupancy and improvement thereof, and giving proof of her qualifications to make the entry claimed. The defendant Andrew Tow asserted a claim to the land under a contract of purchase made with the Sioux City & St. Paul Company under date of March 15, 1887. The contest thus initiated was heard in due form before the register and receiver of the local office, and thence carried before the commissioner of the land office, who found in favor of the complainant, giving her

homestead entry a preference over the right asserted by Andrew Tow. The latter appealed the case to the secretary of the interior, who, by an opinion filed February 16, 1900, reversed the ruling of the commissioner, holding that under the proper construction of section 4 of the act of congress of March 3, 1887, the rights of Tow, as a purchaser from the railway company, were superior to those of complainant as a settler under the homestead act, and that Tow was entitled to a confirmatory patent for the land in dispute. The secretary, in his opinion, states the facts to be that the, complainant, Mrs. Manley, with her husband, entered into possession of the land in July, 1885, at which time they established their residence thereon, which was continued until complainant was deserted by her husband, from whom she obtained a divorce in 1890; that for a time after such desertion complainant lived with her mother on the adjoining land, but then resumed the actual occupancy of the premises, living thereon with her children; that the. land had been cultivated and improved by the Manleys long prior to the date of Tow's contract to purchase; and that, when the contract of purchase was made, Tow knew that the Manleys were in possession of the premises. By the bill filed the complainant challenges the construction placed by the secretary of the interior on the provisions of the act of 1887, claiming that it was an error of law to hold that the statute, as applied to the facts, gives the preference to Tow, whose contract of purchase was not made until after the date of the act of March 3, 1887, and the purchase being of a tract of land which had never been conveyed to the railway company, and which had never been earned by the railway company under the terms of the grant of 1864, and which was in the actual possession of complainant, as a settler, when the contract of purchase was entered into by the defendant.

The defendants interpose a general demurrer to the bill, and in support thereof some question has been made in the argument upon the point whether the controversy is within the jurisdiction of the court, under the rule recognizing the finality of the action of the land department in the disposal of the public lands. It is well settled that the conclusiveness of the decisions of the land department is confined to matters of fact, or, as is said by the supreme court in Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848, that, as to the facts upon which the decision of the department is based, in the absence of fraud or mistake, that decision is conclusive, even in courts of justice, when the title afterwards comes in question; but that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and imposition, "and in cases where it is clear that those officers have, by a mistake of the law, given to one man the land which, on the undisputed facts, belonged to another, to give appropriate relief." The allegations in the bill do not charge that any fraud or imposition has been practiced upon the officers of the land department, and therefore the facts found by them cannot be questioned in this proceeding. The bill does charge, in effect, that the secretary erred in his construction of the act of 188⁻, and as a result of that error he reversed the ruling of the commissioner in favor of complainant, and directed the is-

suance of a patent to the defendant; and thus it is made plain that the controversy presents questions of law of which the court can rightfully entertain jurisdiction.

On behalf of complainant it is contended that under the peculiar language of the land grant act of 1864 the state of Iowa had the right, upon the failure of the company to complete the construction of the entire line of railway from Sioux City to the state line, to resume the unearned portion of the grant, and to regrant it for the purpose of securing the completion of the proposed road; and therefore it must be held that, when the state legislature adopted the act of 1882, resuming the unearned portions of the grant, it thereby adjusted this grant in such sense that it is excepted from the operation of the readjustment act of 1887, the first section of which directs the secretary of the interior to immediately adjust "each of the land grants made by congress to aid in the construction of railroads and heretofore unadjusted." While the action of the state undoubtedly affected the status of the lands, and if the state, after the adoption of the resumption act of 1882, had regranted the unearned lands, specifically describing the same, to another company, thereby securing the completion of the line of railway, the rights of the latter might be measured by the action of the state, yet such grant was not made, and the United States continued to hold an interest therein; for under the terms of the grant of 1864 the unearned lands were to revert to the United States. Under these circumstances it was open to the United States to ascertain the extent of the interest which the railway company had acquired in the lands embraced within the grant, and to that end the land department could rightfully act under the power given by the readjustment statute of 1887, which power and right was the basis of the suit brought by the attorney general in the name of the United States against the railway company, and which, being carried to the supreme court, resulted, as already stated, in the ruling that the company had no right to or title in the unearned lands. Without further consideration of this point, it must be held that the rights of the adversary parties to this suit are to be determined by the construction of the act of 1887.

The first question to be considered is whether the provisions of section 4 of the act are applicable to persons who did not purchase lands from the railway company until after the adoption of the readjustment act of March 3, 1887. In the opinion filed by the secretary of the interior it seems to be assumed that persons purchasing from the railway company after the adoption of the act are entitled to the same protection as are those who bought before the passage of the act. Section 4 declared "that as to all lands, except those mentioned in the foregoing sections, which have been sold by the grantee company to citizens of the United States, * * * the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased." It will be kept in mind that one of the purposes of the act of 1887, as declared in its title, was to provide "for the forfeiture of unearned lands," and the question presented by the facts of this case is whether congress, when it undertook to provide the means whereby lands not earned under the terms of the grant, and

which, in all good faith, belonged to the United States, should be restored to the public domain, it nevertheless intended to recognize the right of third parties to purchase the unearned lands from the defaulting companies without providing any limit of time upon such right, and, furthermore, to give to such purchasers preference over actual settlers in possession of the lands so purchased. In the case already cited of Sioux City & St. P. R. Co. v. U. S., 159 U. S. 349, 16 Sup. Ct. 17, 40 L. Ed. 177, it is said:

"If the terms of an act of congress granting public lands admit of different meanings,—one of extension, and the other of limitation,—they must be accepted in a sense favorable to the grantor; and, if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of congress to confer them. Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733–740, 23 L. Ed. 634. Acts of this character must receive such construction as will carry out the intent of congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. Railroad Co. v. Barney, 113 U. S. 618–625, 5 Sup. Ct. 606, 28 L. Ed. 1109. Nothing is better settled, this court has said, than that statutes should receive a sensible construction, such as will effectuate the legislative intent, and, if possible, so as to avoid an unjust or an absurd conclusion. Lau Ow Bew v. U. S., 144 U. S. 47–59, 12 Sup. Ct. 517, 36 L. Ed. 340. Giving effect to these rules of statutory interpretation, we cannot suppose that congress intended that the railroad company should have the benefit of more lands than it earned."

The natural construction of the words used in the fourth section, to wit, "that as to all lands * * * which have been sold by the grantee company," would limit the application of the section to the lands that had been sold previous to the date of the act. If it be held that the section applies also to lands sold after the act took effect, then, by construction, the rights of the grantees and purchasers holding under it are enlarged as against the rights of the grantor, to wit, the United States. Furthermore, if the provisions of section 4 are held to apply to unearned lands sold after the adoption of the resumption act of 1887, then it will result in giving the preference to speculating purchasers over actual settlers, who have spent time, labor, and money in the building up homes upon these lands, and will be a complete reversal of the rule heretofore followed by congress, by the land department, and the courts in dealing with the disposition of the public domain, to wit, to give the preference to the actual settler. Thus, in Lytle v. Arkansas, 9 How. 314, 13 L. Ed. 153, it is said, speaking of a claim under the pre-emption statute:

"It is founded in an enlightened public policy, rendered necessary by the enterprise of our citizens. The adventurous pioneer, who is found in advance of our settlements, encounters many hardships, and not infrequently dangers from savage incursions. He is generally poor; and it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite site selected by him, not to exceed 160 acres. That this is the national feeling is shown by the course of legislation for many years."

In Clements v. Warner, 24 How. 397, 16 L. Ed. 696, it is declared that:

"The policy of the federal government in favor of settlers upon public lands has been liberal. It recognizes their superior equity to become purchasers of a limited extent of land, comprehending their improvements, over that of any other person."

In Rector v. Gibbon, 111 U. S. 276, 4 Sup. Ct. 605, 28 L. Ed. 427, it is said:

"Whenever congress has relieved parties from the consequences of defects in their title, its aim has been to protect those who, in good faith, settled upon public lands, and made improvements thereon. * * * There has been in this respect in the whole legislation of the country a consistent observance of the rules of natural right and justice."

In Railroad Co. v. Amacker, 175 U. S. 564, 20 Sup. Ct. 236, 44 L. Ed. 274, we find the statement that:

"It was long ago said by this court 'that the policy of the federal government in favor of settlers upon the public lands has been liberal. It recognizes their superior equity to become the purchasers of a limited extent of land, comprehending their improvements over that of any other person.' Clements v. Warner, 24 How. 394–397, 16 L. Ed. 695. And, in a later case that, 'The law deals tenderly with one who in good faith goes upon the public lands with a view of making a home thereon.' Ard v. Brandon, 156 U. S. 537, 15 Sup. Ct. 406, 39 L. Ed. 524."

In Moss v. Dowman, 176 U. S. 413, 20 Sup. Ct. 429, 44 L. Ed. 526, the declaration is that:

"The obvious purpose of the pre-emption and homestead statutes of the United States is to secure to the actual settler the land upon which he has settled, and to give him the prior right to perfect title by purchase or continued occupation. While, undoubtedly, under the provisions of the statutes and the regulations of the land department, there are opportunities for a speculator to obtain title to public lands, it must be always remembered that in the eye of the public land laws of the United States the speculator is never an object of favor. Pre-emption and homestead laws were enacted for the benefit of the actual settler, and to that end they should be construed and administered. The plaintiff herein contends that this tract of land was withdrawn for five years from settlement by mere successive entries in the land office, and could be kept thus withdrawn in the future indefinitely, while speculators wait such time as it becomes convenient to them to perfect title by settlement and occupation. The proposition thus made is so offensive to the spirit and purpose of the land laws of the United States that, unless the statutes make such a result necessary from a true construction of their language, it ought to be rejected. Again and again has this court affirmed the proposition that the settler is the beneficiary of the pre-emption and homestead laws of the United States."

A construction of the readjustment act of 1887, which would result in giving preference to persons whose claims originated after actual possession had been taken by the settler, would certainly be against the rule followed in all previous legislation and in the judicial decisions based thereon, and could not be justified unless the language of the act is so clear to that end that the legislative intent to change the existing rule is clearly manifested. I can conceive of no equity existing in persons purchasing portions of the unearned lands after the time when congress, by adopting the act of 1887, had declared its purpose to forfeit the unearned lands, which calls for protection either against the United States, or against actual settlers whose occupancy and improvements antedate the purchase from the delinquent railway company; and in view of the settled rules that in the construction of grants of the public domain in cases of doubt the interpretation most favorable to the government must be adopted, and as between rival claimants preference will be given to the actual settler, there seems to be no reason calling for an enlarged construc-

tion of section 4 of the act, so as to extend its benefits to persons who have become purchasers of portions of the unearned lands after the date of the adoption of the act. It is not meant by this that one purchasing after the adoption of the act may not have equities which will be recognized under some circumstances, but the view taken is that such a purchaser cannot avail himself of the provisions of section 4, which gives to the purchaser of lands "which have been sold by the grantee company" a right to a patent relating back to the date of the original certification or patenting, and thus enables the purchaser to defeat the rights and equities of third parties coming into existence before the date of the purchase, but subsequent to the date of the original certification or patenting to the railway company. If the construction of section 4, thus indicated, be the correct one, it follows that the secretary of the interior erred in holding, as a matter of law, that the defendant Tow, who did not become a purchaser of the land in dispute until after the adoption of the act of 1887, was entitled to a patent under the provisions of section 4, thus preferring him over the rights and equities of complainant, which had attached to the land long prior to the date of Tow's purchase. If, however, the construction indicated of section 4 cannot be sustained, then we are brought to a consideration of the meaning of the words "certified or patented by the United States to or for the use or benefit of any company," for in section 5 of the act it is declared:

"That where any said company shall have sold to a citizen of the United States, * * * as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the bona fide purchaser thereof from said company to make payment to the United States, and thereupon patents shall issue therefor to the said bona fide purchasers, his heirs or assigns. Provided, that all lands shall be excepted from the provisions of this section which at the date of such sales were in the bona fide occupation of adverse claimants under the pre-emption or homestead laws of the United States, and whose claims and occupation have not since been voluntarily abandoned. as to which excepted lands the said pre-emption and homestead claimants shall be permitted to perfect their proofs and entries and receive patents therefor."

The lands in dispute in this case are coterminous with the completed sections of the railway, are of the odd-numbered sections named in the original grant, but, in effect, have been excepted from the operation of the grant by reason of the failure to construct the road from Le Mars to Sioux City; and hence it follows that, if they have not been conveyed to or for the use of the Sioux City & St. Paul Company, within the meaning of section 5, the rights of the homestead claimant must be preferred over those of the purchaser from the company. It will be remembered that the state of Iowa never conveyed or transferred to the railway, or to any one for its use or benefit, the unearned lands in O'Brien and Dickinson counties. These lands were patented to the state, it being recited in the patent that they were for the use and benefit of the Sioux City & St. Paul Railroad Company; but, owing to the failure of the company to complete the line from Le Mars to Sioux City, the state refused to

patent them to the company, and the legal title thereto never passed to the company. It is strongly contended on part of the defendant that the transfer to the state was a conveyance for the use and benefit of the company, but the true intent and meaning of this patent is to be derived from a consideration of its real purpose, and of the authority, with reference to this grant, conferred by the act of congress of 1864 upon the land department and the state of Iowa. The act of congress did not name the Sioux City & St. Paul Company as the grantee or beneficiary of the donation thereby made. The act granted the lands to the state of Iowa, as a trustee, to secure the building of a line of railway from Sioux City to the Minnesota state line; and it is expressly declared in the act that the lands are granted to the state, "subject to the disposal of the legislature of Iowa for the purposes aforesaid, and no other"; and in the fourth section of the act it is declared:

"That if the said roads are not completed within ten years from their several acceptance of this grant, the said lands hereby granted and not patented shall revert to the state of Iowa for the purpose of securing the completion of said roads within such time, not to exceed five years, and upon such terms as the state shall determine: and provided further, that said lands shall not in any manner be disposed of or be incumbered except as the same are patented under the provisions of this act."

It would have been a violation of the terms of the grant if the state had conveyed these unearned lands to the company. The secretary of the interior had no authority to issue a patent of the lands to the state, except for the purposes of, and subject to the limitations contained in, the grant, and therefore the patent issued to the state must be construed in the light of the limitations contained in the act of congress, which was the source of the authority of the secretary with respect to these lands.

The statement in the patent that the lands named therein are conveyed to the state for the use and benefit of the railway company means only that the lands are conveyed to the state to be disposed of for the use and benefit of the railway company according to the provisions of the original grant. If the company had earned the lands by completing the entire line of railway provided for in the grant, then it would have been the duty of the state to have conveyed the lands to the company; but it was equally the duty of the state not to convey the lands to the company except as they were earned under the terms of the grant, and, the company having failed to earn them, it acquired no title or right, legal or equitable, thereto, and it became the duty of the state to hold the lands for the benefit of the United States, to whom they reverted under the express provisions of the act of 1864. Thus, in the case of Sioux City & St. P. R. Co. v. U. S., 159 U. S. 349, 16 Sup. Ct. 17, 40 L. Ed. 177, it is said by the court:

"Another contention is that, upon the issuing of the patents of 1872 and 1873 to the state for the use and benefit of the railroad company, the title vested absolutely in the company, and the lands were thereby freed from restraints of alienation, from conditions subsequent, or from liability to forfeiture. In support of this contention reference is made to Bybee v. Railroad Co., 139 U. S. 663, 674, 676, 11 Sup. Ct. 641, 35 L. Ed. 305; Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. 336, 27 L. Ed. 201; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687; Salt

Co. v. Tarpey, 142 U. S. 241, 12 Sup. Ct. 158, 35 L. Ed. 999; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 6, 11 Sup. Ct. 389, 35 L. Ed. 77. But these are cases, as an examination of them will show, in which the grant was directly to the railroad company, or in which the act of congress required that the patents for lands earned should be issued, not to the state for the benefit of the railroad company, but directly to the company itself. In the case now before us the statute directed patents to be issued to the state for the benefit of the company. So that, until the state disposed of the lands, the title was in it, as trustee, and not in the railroad company. Schulenberg v. Harriman, 21 Wall. 44, 59, 22 L. Ed. 551; Iron Co. v. Cunningham, 155 U. S. 372, 15 Sup. Ct. 103, 39 L. Ed. 183. See, also, Railroad Co. v. Brown, 39 Iowa, 655; Sioux City & St. P. R. Co. v. Osceola Co., 43 Iowa, 318, 321. In the case last named the Sioux City Company was relieved from the payment of taxes upon some of the lands patented to the state for its benefit, upon the ground that the legal title was in the state, and the lands for that reason were not taxable. The question is altogether different from what it would be if patents for these lands had been issued, or if the state had conveyed them directly, to that company."

As I construe section 5, it was intended thereby to give the preference to claimants under the homestead and pre-emption laws, whose rights of occupancy were in existence at the date of the purchase from the railway company, as to all unearned lands the title to which had not been conveyed to the company, or, for its use, to some third party. To give the preference to the purchaser under the provisions of this section, it must appear that at the date of the sale to him by the railway company the title to the land purchased had been conveyed by the United States to the company, or to some one for its use and benefit. A conveyance by the United States of land to a third party as a trustee, to be held by the trustee in order to ascertain whether the railway company will earn the lands, it being the duty of the trustee to reconvey the lands to the United States if the conditions of the grant are not performed, is not a conveyance to the company, or for its use, within the meaning of section 5 of the readjustment act. The mere transfer of the lands to the state as a trustee did not vest a title thereto in the railway company, nor did the company ever occupy a position which enabled it to rightfully demand a conveyance of the lands from the state. It is well known that the company made vigorous efforts to secure a conveyance of the lands from the state, but wholly failed. In the case of Sioux City & St. P. R. Co. v. Osceola Co., 43 Iowa, 318,—a case arising under the same grant,—it was held by the supreme court of Iowa "that, as the performance of the conditions annexed to the grants by the state was left to the determination of the governor of the state, the railroad companies acquired no property in the land granted until the governor had issued a patent or certificate, as required by the statute, showing that the corporations had earned the lands by the completion of the road, or parts thereof, as prescribed by the conditions of the grant." A person purchasing any part of these unearned lands from the company would be making a purchase from a grantor in whom the title had not vested as a matter of law, and who had not created an equitable claim to the lands by a performance of the conditions of the grant; and by such a purchase the legal title would not pass to the purchaser, nor would he thereby become possessed of an equity superior to the actual settler, who was in possession of the premises

at the date of the purchase. If this is the correct construction of this section, then it follows that, if the complainant was, at the date of the purchase by the defendant Tow, a bona fide occupant of the premises under the homestead laws, she is entitled to be preferred in the disposition of this land. The only objection urged against the good faith of the occupancy upon which the complainant bases her claim is that at the time such occupancy began the land was withdrawn from entry by operation of the grant contained in the act of 1864, and the action of the land department based thereon; it being contended that she was a mere trespasser upon the premises. This question is put at rest by the ruling of the supreme court in Iron Co. v. Cunningham, 155 U. S. 354, 15 Sup. Ct. 103, 39 L. Ed. 183, wherein it is said:

"But it is said by the counsel for the company that it was not a bona fide homestead claim, because at the time the defendant entered upon the land he understood that it was a part of a railroad grant. * * * If he did, he knew that this railroad grant had been outstanding thirty-two years, that the land was to be restored to the government if the road was not completed within ten years, and that twenty-two years had passed since the time fixed by congress for the completion of the road, and nothing had been done. His expectation was (and, under the circumstances, not an unreasonable one) that congress would at some near time interfere to remove all this outstanding claim. Under those circumstances, and in expectation of such removal, he enters upon the land. Can it be said that this entry and occupation was with the view of depriving anybody of title, or 'that it was, as against the company, a wrongful entry? If the construction contended for were accepted, it would exclude from the benefit of the act any settler upon these lands who knew that the land he entered upon was within a railroad grant. But legislation respecting the public lands is to be construed favorably to the actual settler, and the construction contended for by the canal company seems to us too narrow. If a party entering upon a tract, although he knew that it was within the limits of an old railroad grant, did so under the honest belief and expectation that the grant, if not technically extinguished by lapse of time, had remained so long unappropriated by any beneficiary that congress would shortly resume it, and in that belief determined to make for himself a home thereon, with a view of perfecting his title under the land laws of the United States when the forfeiture should be finally declared, it must be held, we think, that he is, within the terms of this confirmatory act, a bona fide claimant of a homestead."

In the case at bar the facts are that the Manleys settled upon the land in dispute in July, 1885, long prior to the date of the purchase by the defendant. There was, therefore, no claim to bar the right of entry by the Manleys, except such as might be asserted on behalf of the railway company under the grant of 1864; but the company had ceased work in 1872, and the state had declared a forfeiture of the unearned lands in 1882, and therefore the Manleys might well assume that the lands would in due time be restored to the public domain, as in fact they were, and therefore, under the ruling in the case just cited, the complainant must be held to be a bona fide claimant of a homestead, and as such, to be protected under the provisions of section 5 of the act of 1887. Can it be said, under the facts of this case, that the defendant Tow is a bona fide purchaser, within the meaning of the term as used in section 5? In the case of U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789, the acts of 1887 and 1896 were under consideration, and it was therein held that:

"Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its benefit, notwithstanding any mere errors or irregularities in the proceedings of the land department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the grants, although within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing, also, that the lands were public lands in the statutory sense of the term, and free from individual claims."

In the case of Winona & St. P. R. Co. v. U. S., 165 U. S. 483, 17 Sup. Ct. 381, 41 L. Ed. 798, it is said, referring to the acts of 1887 and 1896:

"It is essential to the protection of these statutes that the party purchasing from the railroad company has no notice by any fact subsequent to and independent of the certification or patent of any defect in title. Such a purchaser cannot claim to be one in good faith if he has notice of facts outside the records of the land department disclosing a prior right."

It is true that in the case just cited the court was dealing with a case wherein the rights of the settlers had attached before the right of the railway company under the grant, but the ruling is to the effect that the purchaser will be bound by notice of facts existing outside the records of the land department. In other words, these acts do not change the ordinary rule that one who buys land, which at the time is in the actual and known possession of a third party, is chargeable with notice of the rights of such occupant. Therefore, when the defendant Tow entered into the contract of purchase with the railway company,—which was on the 15th of March, 1887,—he knew that the complainant was in the open, actual possession of the land, using the same as a home for herself and her family. To defeat the rights of the complainant, he must become the purchaser of a title which was superior to and would defeat the rights of complainant under the homestead laws of the United States. The title he in fact bought was that of the railway company, and at the time of the purchase this alleged title was of no avail against the rights of complainant. At the date of the contract of purchase entered into by the defendant in 1887, the company had wholly ceased work on the road for fully 15 years. The title to the land had never been conveyed to the company. In 1882 the state had resumed the unearned lands, and the resumption act of 1887 had been adopted. It cannot, therefore, be said, in any just sense, that the defendant was a bona fide purchaser of these lands, as against the rights of the complainant, she being an actual settler and claimant under the homestead act. It is the fact of actual settlement for the purpose of creating a home that creates the equity which is given priority in the disposition of the public domain, and this actual occupancy may be based upon a purchase from the railway company as well as upon an entry under the preemption or homestead laws of the United States. This was the principle recognized in the case of Linkswiler v. Schneider (C. C.) 95 Fed. 203. In that case the facts were that Schneider had purchased the land in dispute in that case from the railway company in 1887, had entered into the open occupancy thereof, and had spent time, labor, and money in building a home upon the premises, and then, in 1896,

Linkswiler endeavored to make an entry of the land as a homestead in the land office at Des Moines, which entry was refused by all the departments in the land office, and the ruling was affirmed by this court. In the case now under consideration the settler claims under the homestead laws, but that difference does not weaken the weight to be given to the fact that the complainant was in the actual and known possession of the land when Tow endeavored to create a right thereto by entering into a contract of purchase with the railway company. A person cannot be deemed to be a bona fide purchaser or a bona fide entryman under the homestead law if at the time he makes his purchase from the railway company, or attempts to make an entry in the land office, another person is in the actual, open, and known possession of the land. In other words, under such circumstances the would-be purchaser or entryman is charged with notice of the rights and equities of the actual occupant.

In the case at bar the conclusion reached is that, as it is shown that when Andrew Tow made his contract of purchase with the railway company the complainant was in the actual and open possession of the premises, to the knowledge of the defendant Tow, the latter cannot, as against the complainant, be deemed to be a bona fide purchaser of the premises; and, furthermore, that the land in dispute, being part of the unearned lands, had not been conveyed to the railway company, or for its use, within the meaning of section 5 of the act of 1887; and, as the defendant did not enter into the contract of purchase until after the adoption of the act of 1887, and until after the unearned lands had been declared to be forfeited by the legislature of Iowa, he cannot be held to be a purchaser in good faith in such sense that he is to be preferred over the complainant. If the conclusions thus reached are well taken, it follows that the construction given to the provisions of the act of 1887 by the secretary of the interior cannot be sustained as a matter of law, and the allegations of the bill show that it was an error of law to award the confirmatory patent to the defendant. In other words, the bill makes a case entitling the complainant to relief in equity against the erroneous issuance of the patent to defendant, and the demurrer must therefore be overruled.