## KNEPPER v. SANDS.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 233. Submitted April 19, 1904.—Decided May 31, 1904.

Section 4 of the act of March 3, 1887, 24 Stat. 556, for the adjustment of forfeited railroad grants providing for issuing patents under the conditions specified for lands sold by the grantee company to purchasers in good faith, has no reference to any unearned lands purchased after the date of the act from a company to which they had never been certified or patented, although such company might have acquired an interest in them had it completed its road. Nor can one who purchased unearned

lands from a grantee company whose grant was made by Congress through the State in which its road was to be built, be regarded as a purchaser in good faith, within the meaning of the act of 1887, when the purchase was made after the passage of the act and after the State had, by legislative enactment, resumed its title to the lands and then relinquished them to the United States on account of the failure to complete its road.

THE facts are stated in the opinion of the court.

*Mr. I. S. Strubble* for appellant.

*Mr. John H. King* and *Mr. M. B. Davis* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

This cause is before us upon questions certified by the Circuit Court of Appeals pursuant to the Judiciary Act of March 3, 1891, c. 517, 26 Stat. 826.

The controlling facts in the extended statement sent up by the Judges of the Circuit Court of Appeals, as the basis of the questions propounded, are these:

By an act approved May 12, 1864, c. 84, Congress made a grant of lands to the State of Iowa for the purpose of aiding in the construction of a railroad from Sioux City to the south line of Minnesota at such point as the State might select— the lands to be held subject to the disposal of its Legislature, for that purpose only. Upon the completion of each section of ten consecutive miles of road it became the duty of the Secretary of the Interior to issue to the State patents for one hundred sections for the benefit of the constructing company; and so on, until the road was completed, when the whole of the lands granted were to be patented "*to the State* for the uses aforesaid, and none other." 13 Stat. 72, §§ 1, 2, 3.

If the road was not completed within ten years from the acceptance of the grant by the constructing company, then the lands granted and not patented were to "revert to the State" for the purpose of securing the completion of the road within such time, not exceeding five years, and upon such

terms as the State should determine—the lands not in any manner to be disposed of or encumbered except as the same were pate1 ed under the provisions of the act, and upon the failure of the State to complete the road within five years after the above ten years then the lands undisposed of were to "revert to the United States." § 4.

The State accepted the grant, April 3, 1866, upon the conditions prescribed by Congress, and authorized the Sioux City and St. Paul Railroad Company, a Minnesota corporation, to construct the road. The company entered upon the work of construction, and completed only five sections of ten miles each, receiving the full amount of land to which it was entitled by reason of such construction.

In consequence of the failure of the railroad company to complete the construction of the road, the State declared by an act approved March 16, 1882, that, in respect of all lands and rights to land granted or intended to be granted to that company, they "are hereby absolutely and entirely resumed by the State of Iowa, and that the same be and are absolutely vested in said State as if the same had never been granted to said company." Before the passage of that act the State, through its executive officers, ascertained by computation that the railroad company had received conveyances for all lands it was entitled to receive under the terms of the grant, and that the State then held legal title to 85,457.41 acres pertaining to the grant, no part of which had then or ever since been earned by the company. The land in question here was a part of those unearned lands.

Subsequently, by an act which took effect April 2, 1884, the State relinquished to the United States all its right, title and interest in the lands which by the above act of 1882 were declared vested in the State.

The land here in dispute, being section 9, township 95, north of range 42, west of the fifth principal meridian, in O'Brien County, Iowa, was open and unoccupied when the above act of April 2, 1884, was passed. In 1885 Sands settled

upon it, erected thereon a house, and made improvements
with a view of establishing a homestead in accordance with
the laws of the United States. He has continuously since
resided upon the land, claiming it as a homestead. Shortly
after he settled upon it he made application to enter it as a
homestead, but his application was rejected; for what reason
rejected, does not appear.

Later, by an act approved March 3, 1887, Congress provided
for the adjustment of land grants made by Congress to aid
in the construction of railroads, and for the forfeiture of un-
earned lands. 24 Stat. 556, c. 376.

The first section of that act provided for the immediate
adjustment, in accordance with the decisions of this court,
of each of the railroad land grants which then remained un-
adjusted. The second section provided for the recovery by
the United States of the title to lands erroneously certified
or patented by the United States to or for the use or benefit
of any company claiming by, through or under grant from
the United States, to aid in the construction of a railroad.
That section made it the duty of the Secretary of the Interior
to demand from such company a relinquishment or recon-
veyance to the United States of all such lands, whether within
granted or indemnity limits, and, if the demand was not
complied with, then it became the duty of the Attorney
General to institute suit against the company. The third
section provided that homestead or preëmption entries of
*bona fide* settlers which were found to have been erroneously
cancelled might be perfected, upon compliance with the public
land laws and certain conditions and the settler reinstated
in his rights. If the settler did not renew his application
within a reasonable time, to be fixed by the Secretary of the
Interior, then all such unclaimed lands were to be disposed
of under the public land laws—according a priority of right
to *bona fide* purchasers of the unclaimed lands, if any, and if
there be no such purchasers, then to *bona fide* settlers residing
thereon.

The fourth section, upon the construction of which the present case mainly depends, is in these words: " § 4. That as to all lands, except those mentioned in the foregoing section, which have been so erroneously certified or patented as aforesaid, and *which have been sold by the grantee company* to citizens of the United States, or to persons who have declared their intention to become such citizens, *the person or persons, so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased,* upon making proof of the fact of such purchase, at the proper land office, within such time and under such rules as may be prescribed by the Secretary of the Interior, after the grants respectively shall have been adjusted; and patents of the United States shall issue therefor, and shall revert back to the date of the original certification or patenting, and the Secretary of the Interior, on behalf of the United States, shall demand payment from the company, which has so disposed of such lands, of an amount equal to the government price of similar lands; and in case of neglect or refusal of such company to make payment as hereafter specified, within ninety days after the demand shall have been made, the Attorney General shall cause suit or suits to be brought against such company for the said amount: *Provided,* That nothing in this act shall prevent any purchaser of lands erroneously withdrawn, certified or patented as aforesaid from recovering the purchase money therefor from the grantee company, less the amount paid to the United States by such company as by this act required. . . ." 24 Stat. 556, c. 376.

As showing the nature of the title of the State under the act of 1864, reference may here be made to a suit brought by the United States against the Sioux City and St. Paul Railroad Company, under which company, as will presently appear, the appellant claims. By the final decree in that case the title of the United States was quieted as to certain lands situated in Dickinson and O'Brien Counties, and claimed by the railroad company under the act of 1864. In the

opinion in that case, which was decided here October 21, 1895, the court said: "Another contention is, that upon the issuing of the patents of 1872 and 1873 to the State for the use and benefit of the railroad company the title vested absolutely in the company, and the lands were thereby freed from restraints of alienation, from conditions subsequent, or from liability to forfeiture. In support of this contention reference is made to *Bybee* v. *Oregon & California Railroad,* 139 U. S. 663, 674, 676, 677; *Van Wyck* v. *Knevals,* 106 U. S. 360; *Wisconsin Central Railroad* v. *Price County,* 133 U. S. 496; *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241; *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1, 6. But these are cases, as an examination of them will show, in which the grant was directly to the railroad company, or in which the act of Congress required that the patents for lands earned should be issued, not to the State for the benefit of the railroad company, but directly to the company itself. In the case now before us the statute directed patents to be issued to the State for the benefit of the company. So that, until the State disposed of the lands, the title was in it, as trustee, and not in the railroad company. *Schulenberger* v. *Harriman,* 12 Wall. 44, 59; *Lake Superior Ship Canal &c. Co.* v. *Cunningham,* 155 U. S. 354. See also *McGregor &c. Railroad* v. *Brown,* 39 Iowa, 655; *Sioux City & St. Paul Railroad* v. *Osceola County,* 43 Iowa, 318, 321. In the case last named the Sioux City Company was relieved from the payment of taxes upon some of the lands patented to the State for its benefit, upon the ground that the legal title was in the State, and the lands for that reason were not taxable. The question is altogether different from what it would be if patents to these lands had been issued, or if the State had conveyed them directly to that company." *Sioux City &c. Railroad* v. *United States,* 159 U. S. 349, 363. It was there adjudged that the railroad company had received 2,004.89 acres more than, in any view of its rights, should have been awarded to it.

After the decision of that case the Secretary of the Interior,

under date of November 18, 1895, published a circular, in which he declared the land here in controversy and other like land subject to disposal by the Land Department. This was after the above application by Sands to enter this land as a homestead.

Subsequently, on the 10th of March, 1896, Sands renewed his application for the land in question as a homestead. That application was contested in the local land office by the present appellant, who asserted a right to the land in virtue of a *purchase* of it *from the Sioux City and St. Paul Railroad Company on June* 21, 1887, and in virtue of the provisions of the fourth section of the above adjustment act of March 3, 1887. She had never resided upon the land in controversy or cultivated the same or in any manner attempted to comply with the homestead laws of the United States for the purpose of obtaining a title under them. This contest was determined at the local office in favor of Sands—that office finding that he had, by virtue of his settlement of and continued residence upon and cultivation of the land, and by full compliance with the homestead laws of the United States, become entitled to a patent. That decision was confirmed by the Commissioner of the Land Office. But upon appeal to the Secretary of the Interior the decisions of the local land office and of the Commissioner were reversed, and Sands' application to enter the land as a homestead was rejected. Thereupon the present suit was commenced by Sands, charging that the officers of the General Land Office, proceeding under the decision of the Secretary, were about to issue or had issued a patent to the present appellant solely by virtue of her alleged purchase on June 21, 1887, from the Sioux City and St. Paul Railroad Company, after the passage of the adjustment act of March 3, 1887, and in virtue of its fourth section. Sands, alleging that such ac ion, if taken, would be unlawful and contrary to law, prayed that the Commissioner be required to accept his proofs showing settlement upon and continuous cultivation of the land for the period of five years or more, and that the patent

to appellant Knepper be either declared null and void, or for a decree declaring that she holds the legal title in trust for him.

Such is the case made by the statement by the Judges of the Circuit Court of Appeals, who propound to this court the following questions:

"First. In view of the provisions of the act of Congress of May 12, 1864, by virtue of which the land in controversy was granted to the State of Iowa, did the action which was subsequently taken in manner and form aforesaid by the Governor and Legislature of the State of Iowa operate as a final adjustment of the grant, so far as the Sioux City and St. Paul Railroad Company was concerned, and, by virtue of its being so adjusted, exempt or except the grant in question from the provisions of the adjustment act of March 3, 1887?

"Second. In view of the terms of the granting act of May 12, 1864, and the action subsequently taken in manner and form aforesaid by the State of Iowa, acting through its Governor and Legislature, can Elmira Knepper, the appellant, be esteemed a purchaser in good faith or a *bona fide* purchaser of the land in controversy, within the meaning of the fourth section of the adjustment act of March 3, 1887, as against John A. Sands, the appellee, who was in the open possession of the land in controversy and had erected valuable improvements thereon, in manner and form aforesaid, when said purchase was made?"

We have seen that the appellant claims an interest in the lands here in question in virtue of a purchase made by her from the railroad company, June 21, 1887, *after* the passage of the adjustment act of March 3, 1887. But what interest had the company at that time in these particular lands constituting a part of the 85,457.41 acres of unearned lands, no part of which the company earned or could have earned except on account of road actually constructed by it. For such road as the company had constructed, lands had been conveyed to it, and there never was a moment, according to the record, when the company could have rightfully demanded from the State

a conveyance or patent for the lands here in dispute or for any of the unearned lands.   The legal title, to the lands granted by the act of 1864 was, first in the United States, next in the State, (*Sioux City &c. Railroad Co.* v. *United States, above cited*,) but never in the company until a conveyance to it by the State.   The State could only have conveyed lands to the company in consideration of constructed road; and subject to that condition the company undertook to construct the road. When it abandoned the work of construction it lost the right to claim lands except for such road as it had previously constructed.   The State therefore properly resumed, as by the act of 1882 it did resume, after the company's default, such title to the unearned lands as it had before authorizing the company to construct the road.   The State after thus resuming the title could have used the unearned lands to aid in the construction of that portion of the road which the railroad company failed to construct.   But it did not do so, and hence by the act of April 2, 1884,—eighteen years after it accepted, in 1866, the grant of 1864 and the completion of the road having been abandoned—the State, by statute, formally relinquished to the United States all its right, title and interest in the unearned lands pertaining to the Sioux City and St. Paul Railroad Company.   This statute was perhaps unnecessary, as by the act of 1864 the title to the unearned lands granted by that act was to revert to the United States after the expiration of fifteen years from the acceptance of the grant without the completion of the road.   But the relinquishment by the State saved the necessity, if there was a necessity, of formal proceedings, legislative or judicial, by the United States to reinvest itself with full title.   Thus the title to the unearned lands was put back into the United States. So that when the adjustment act of 1887 was passed, the title of the United States to the unearned lands, including the particular lands here in dispute, was complete and perfect. No interest then remained in the State or in the railroad company requiring an adjustment; for, as stated, the State had

relinquished all its claim, and the railroad company had received all the lands it was entitled to demand for constructed road. When, therefore, Congress made provision in the fourth section of the act of 1887 for the protection of those who in good faith had purchased from any "grantee company," to whom lands had been erroneously certified or patented, it could not have intended to refer to purchases made from the railroad company, after that act took effect, of lands originally certified or patented to the State and not to the railroad company, and the legal title to which was in the United States at the date of the passage of the act. A chief purpose of the act of 1887 was to declare forfeited unearned lands and restore them to the public domain, and not to give third parties and speculators an opportunity to purchase such lands from companies which had defaulted in the work of construction, and to whom the State had never conveyed, and thereby obtain a preference over actual settlers in possession. The policy of the Government has always been favorable to actual settlers. As late as *Ard.* v. *Brandon,* 156 U. S. 537, it was said that "the law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon." See also *Northern. Pacific Railroad* v. *Amacker,* 175 U. S. 564; *Moss* v. *Dowman,* 176 U. S. 413; *Rector* v. *Gibbon,* 111 U. S. 276; *Nelson* v. *Northern Pacific Railway,* 188 U. S. 108, 123.

We are of opinion that the fourth section of the adjustment act of 1887 has no reference to any unearned lands purchased after the date of that act from a company to whom they had never been certified or patented, although, if it had kept its engagement with the State and completed the road, in due time, it could have acquired an interest in them; and that, as the State by legislative enactment, had resumed the title it acquired from the United States, and afterwards relinquished its interest to the United States—all before the passage of the adjustment act—the appellant could not, within the meaning of the act, and after its passage, have become a purchaser in good faith of the lands here in dispute. The sale by the rail-

road company to the appellant was a sale of something it did not possess, a mere device to bring its purchaser within the provisions of the adjustment act of 1887 when that act was never intended to apply to such a case.

We, therefore, answer the second question in the negative, and omit as unnecessary any answer to the first one.

*It will be so certified.*