SCOTT LOGAN, Appellant, v. W. R. DAVIS.

**Public Lands:** RAILROAD GRANT: GOOD FAITH PURCHASER: EVIDENCE: STATUTES. In this action the plaintiff is seeking to establish his title to unearned railroad land, and to which the railroad company never acquired title, under the Act of Congress providing that citizens of the United States who were good faith purchasers ïfrom a railroad company of lands erroneously certified or patented to it should be entitled to purchase the land of the government, as against the defendant who had taken possession of the land as a- homestead entryman. Upon a review of the evidence it is held that plaintiff was not a good faith purchaser within the meaning of the Act of Congress.

It is also held that the Act of Congress in question does not apply to unearned lands purchased after the date of the Act.

**Equitable Estoppel.** One invoking the doctrine of equitable estoppel must show that he had no knowledge of the facts relied upon as constituting the estoppel, and no convenient and available means of acquiring such knowledge; and where the facts are known to both parties or both have the same means of ascertaining the facts there can be no estoppel.

**Same.** The act of an officer of the land department in permitting one to urge his claim as a contract purchaser of railroad lands which had been forfeited, and of which he was not a good faith purchaser, and the subsequent issuance of a patent for the land to him, will not operate as an estoppel against the claim of a homestead entryman so as to preclude the entryman from questioning the validity of plaintiff's patent in a suit by him to recover the land.

**Public Lands:** EQUITABLE TITLE: NOTICE. The plaintiff in this action at the time he secured his claimed interest in the land in controversy, having had actual notice of a hostile and superior title, acquired no equitable title to the property in himself.

**Same:** HOMESTEAD ENTRY: TRESPASS. The defendant in this action entered upon certain public lands at a time when it was not subject to public entry, invading at the time the actual but wrongful possession of plaintiff. Subsequently the land became subject to entry and defendant continued to occupy it without protest, filing thereon a homestead claim, until it was erroneously patented to

plaintiff. *Held,* that as defendant had been for several years in peaceable and uninterrupted possession his homestead claim made in good faith was not subject to the objection that his original possession was obtained by trespass.

*Appeal from O'Brien District Court.*—HON. DAVID MOULD, Judge.

FRIDAY, FEBRUARY 11, 1910.

REHEARING DENIED SATURDAY, MAY 14, 1910.

THE opinion states the case.—*Affirmed.*

*W. P. Briggs,* for appellant.

*Madison B. Davis* and *Edwin J. Stason,* for appellee.

SHERWIN, J.—This is a suit for the recovery of real property; the plaintiff alleging that he is the absolute owner thereof, and that the defendant unlawfully keeps him out of possession. The land in controversy is within the limits of the grant by act of Congress approved May 12, 1864, chapter 84, granting lands to the state of Iowa "for the purpose of aiding in the construction of a railroad from Sioux City, in said state to the south line of the state of Minnesota at such point as the said state of Iowa may select, also to said state, for the use and benefit of the McGregor Western Railroad Company for the purpose of aiding in the construction of a railroad from a point at or near Main street, South McGregor, in a westerly direction . . . . until it shall intersect with the said road running from Sioux City to the Minnesota state line." The grant was of every alternate odd-numbered section for ten sections in width on each side of the roads, and provides that the lands thereby granted should be subject to the disposal of the Legislature of

Iowa for the purposes aforesaid, and further provided:
"When the Governor shall certify to the Secretary of the
Interior that any section of ten consecutive miles of either
of said roads is completed, . . . then the Secretary
of the Interior shall issue to the state patents for one
hundred sections of land for the benefit of the road having
completed the ten consecutive miles as aforesaid." It was
also provided further: "That if the said roads are not
completed within ten years of their several acceptance of
this grant, the said lands hereby granted and not pat-
ented shall revert to the state of Iowa for the purpose
of securing the completion of the said roads within such
time, not exceeding five years, and upon such terms as
the state shall determine"—and, further that said lands
shall not in any manner be disposed of or incumbered
except as the same are patented' under the provisions of
this act, "and should the state fail to complete the said
roads within five years after the ten years aforesaid, then
said lands undisposed of as aforesaid shall revert to the
United States." This grant was duly accepted by the
state of Iowa and by the Sioux City & St. Paul Railroad
Company by a resolution of its board of directors, dated
September 19, 1866. The said company afterwards lo-
cated its line of road, filled its map of location, which
was accepted by the Secretary of the Interior, as the
basis of the adjustment of the grant, and in August, 1867,
all of the odd-numbered sections of land within the twen-
ty-mile limits of the Sioux City & St. Paul Railroad, as
shown by map of definite location, were withdrawn from
sale or other disposition. During the year 1872 the Sioux
City Company constructed its road. from the Minnesota
line south to Le Mars, a distance of fifty-six and one-
fourth miles, and the construction of five ten-mile sections
of the road was certified to the Secretary of the Interior,
who caused to be issued to the state for the use and benefit
of the Sioux City Company patents for land selected by it,

amounting to four hundred and seven thousand eight hundred and seventy and twenty-one hundredths acres, including the land in controversy. The Sioux City & St. Paul Company never constructed its line south from Le Mars, nor did the state cause that portion of the road to be constructed. By authority of the Legislature the state certified or patented to the Sioux City Company within the granted and indemnity limits a total of three hundred and twenty-two thousand four hundred and twelve and eighty-one hundredths acres. But the land in controversy was not included therein, nor was it ever certified or patented to any railroad company. In 1878 the Chicago, Milwaukee & St. Paul Railway Company, the successor of the McGregor Western Railway Company, completed the construction of its road to Sheldon, Iowa, where it intersected the line of the Sioux City & St. Paul Company, and soon thereafter it brought suit against the latter company for the purpose of determining the title to the land within the overlapping limits. That suit resulted in a decree giving to the Milwaukee Company lands which had been patented to the Sioux City Company and other lands not patented, but not the land in controversy herein. See *Sioux City & St. Paul R. Co. v. Chicago, M. & St. P. R. Co.,* 117 U. S. 406 (6 Sup. Ct. 790, 29 L. Ed. 928). While this suit between the two railroad companies was pending the Legislature in 1882 passed an act (Acts 19th General Assembly, chapter 107) resuming and vesting in the state "all lands and rights to lands granted" to the Sioux City Company under the act of Congress of May 12, 1864, and the acts of the General Assembly of the state, "which have not been earned by the said railroad company." March 27, 1884, the Legislature passed another act (Acts 20th General Assembly, chapter 71) which provided that the lands resumed and intended to be resumed by the act of 1882 were thereby relinquished and conveyed to the United States and the Governor was there-

by authorized and directed to certify to the Secretary of the Interior all lands which had theretofore been patented to the state to aid in the construction of the said railroad, and which had not been patented by the state to the Sioux City Company, except lands situated in the counties of Dickinson and O'Brien. This act was complied with in January, 1887, and twenty-six thousand one hundred and seventeen and thirty-two hundredths acres were so certified. The land in controversy being in O'Brien County was not included therein. Next in the chronology of events was the act of Congress of March 3, 1887 (Act March 3, 1887, chapter 376, 24 Stat. 556 [U. S. Comp. St. 1901, page 1595]), which act provides as follows:

Section 1. That the Secretary of the Interior be and is hereby authorized and directed to immediately adjust, in accordance with the decisions of the Supreme Court, each of the railroad land grants made by Congress to aid in the construction of railroads and heretofore unadjusted.

Sec. 2. That if it shall appear upon the completion of such adjustments respectively, or sooner, that lands have been, from any cause, heretofore erroneously certified or patented by the United States to or for the use or benefit of any company claiming by, through or under grant from the United States, to aid in the construction of a railroad, it shall be the duty of the Secretary of the Interior to thereupon demand from such company a relinquishment or reconveyance to the United States, of all such lands, whether within granted or indemnity limits. . . .

Sec. 4. That as to all lands which have been so erroneously certified or patented as aforesaid, and which have been sold by the grantee company to citizens of the United States, or to persons who have declared their intention to become such citizens, the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as may be prescribed by

the Secretary of the Interior, after the grants respectively shall have been adjusted.

At the time of the passage of this act, there were lands in O'Briėn and Dickinson Counties that had been patented to the state, but never to the railroad company, and which the state still held, amounting to twenty-one thousand six hundred and ninety-two and eighteen one-hundredths acres. At this time also the Sioux City Company had received from the state patents for all of the lands it had earned or was entitled to under the grant. On August 11, 1887, the United States requested the state to reconvey to it the twenty-one thousand six hundred and ninety-two and eighteen one-hundredths acres, which included the land in controversy. On the 11th day of September, 1888, one Ellen M. Childs entered into a written contract with the Sioux City Company for the purchase of the land in controversy, making a small payment in cash and agreeing to pay the balance in installments. On the 4th day of October, 1889, the United States commenced an action against the Sioux City Company and others asking that its title to the twenty-one thousand six hundred and ninety-two and eighteen one-hundredths acres be quieted. Such action was finally tried, and resulted in a decree in favor of the United States. *Sioux City & St. Paul Railroad Company v. United States*, 159 U. S. 349 (16 Sup. Ct. 17, 40 L. Ed. 177). On October 8, 1889, the plaintiff took an assignment of the Childs contract, and on the same day entered into an agreement with the railroad company as follows:

That in the event of a decision in the above-entitled action in the United States Supreme Court adverse to said Sioux City & St. Paul Railroad Company as to the title to the said lands above described, the said parties of the second part will within ninety days thereafter surrender said original agreement and this modification thereof to the parties of the first part, at St. Paul, Minnesota, and re-

ceive therefor from the said parties of the first part, or either of them, the amount which has been paid on the said agreement on account of principal and interest mentioned in said original agreement, and the same to be received and accepted by said second parties in full settlement of all their rights under said original agreement and this modification thereof, and as a release of any and all claims suffered by said parties of the second part, their heirs, executors, administrators or assigns, by reason of the failure of the title of said parties of the first part to said land.

It was also agreed between the plaintiff and the company that the time of the payments would be extended, and that the company would pay the taxes.

The facts relative to the possession are as follows: Up until 1884 it was unimproved, vacant, wild prairie. In that year one Bierbower broke a few furrows around the entire half section, but did not reside on the land. In the same year one Peterson broke four or five acres along the south line of the land, but left during the same year, and made no claim to it. In the same year one Fitzgerald, who lived on adjacent land, broke six or seven acres in the northeast corner, and in 1885 cropped the land broken and continued in possession until 1890, except as hereinafter stated. In 1887 one Weir built a small house on the south half of the northwest quarter of the section, moved into the house with his family, and cultivated a part of the land. On the 1st of April, 1888, the defendant bought Weir's improvements and his interest in the land and moved into the house with his family, where he has lived up to the present time. Early in 1888 Fitzgerald leased the land of the Sioux City Company and remained in possession as its tenant that year, and the following year as the tenant of plaintiff's assignor. In the spring of 1888 the defendant sowed five or six acres of oats on breaking that had been done on the land before he moved on to it, but, when he attempted

to harvest the crop, Fitzgerald took possession thereof and retained same. May 1, 1890, the defendant with a gang of men with teams went on to the land in controversy and broke up that part of it which had not been broken, and has since then continued to farm the land. In due time the plaintiff made application for a patent as a purchaser from the railroad company, and the defendant made due and regular application for the entire quarter section, including the land in controversy, as a homestead. The Secretary of the Interior held in favor of the plaintiff, and a patent was issued to him in May, 1901. He then commenced this action, as we have heretofore stated. It was tried in equity and resulted in a decree for the defendant for the N. $\frac{1}{2}$ of N. W. $\frac{1}{4}$, 17-97-42, from which the plaintiff appeals. There was a decree for plaintiff as to lot three, and no appeal is taken therefrom.

The plaintiff relies for a reversal of the judgment upon the following propositions: First, because the defendant acquired possession of the land in controversy by trespass, and under this head it is said that the defendant could not at the time homestead more than eighty acres, and, farther, could then acquire no homestead rights therein because it was then reserved by the United States; second, an estoppel based on the fact that the plaintiff was a good-faith purchaser within the meaning of the act of Congress of 1887; and, further, under the same head, for the reason that the defendant was in privity with the United States, and must show that he is entitled to a patent under the homestead law; third, that both the United States and the defendant are estopped by the allegations of the former in its suit against the Sioux City Company; fourth, that, where one of two equitable titles of equal strength is joined with the legal title without notice of the other equity, the legal title can not be

successfully assailed by the holder of the other equity; and, fifth, the equities are· with the plaintiff.

In support of the decree, the appellee contends that the act of May 12, 1864, was not a grant *in praesenti* to the Sioux City Company, but a grant to the state in trust, the trust to be administered in a particular manner; that the title to the land remained in the state, and was restored and reconveyed to the United States as unearned land, and was at no time vested in the railroad company; that the act of March 3, 1887, was a general one applicable to all grants, but contemplated adjustments only where the grant had vested the title in the railroad company, and not where, as in the act of 1864, the title remained in the state, or where it had reverted to the United States on account of the failure of the railroad company to earn the grant within the stipulated time; that the appellant was not a purchaser in good faith under the act of 1887, or independent of it, and is not entitled to protection as such; that the plaintiff, being only a speculator and purchaser in bad faith, ·acquired no rights in the land against the defendant's rights as a homestead claimant; that the defendant, having made legal settlement on the land, has done all that he is required to do to perfect his homestead right, and all that he is required to do to protect it.

It is more convenient to first take up the appellee's propositions. The appellant concedes that the act of 1864 was not a grant *in praesenti* to the railroad company; hence we need give that subject no consideration. In view of the conclusion which we reach on other matters presented, we deem it unnecessary to determine whether the land in controversy was subject to adjustment under the act of March 3, 1887. The question was certified to the Supreme Court of the United States in *Knepper v. Sands*, 194 U. S. 476 (24 Sup. Ct. 744, 48 L. Ed. 1083). It was not definitely determined, however, the

court saying that its determination was unnecessary. But
the court did say that it was "of the opinion that the
fourth section of the adjustment act of 1887 had no refer-
ence to any unearned land purchased after the date of
that act from a company to whom they had never been
certified or patented, athough, if it had kept its engage-
ment with the state and completed the road in due time,
it could have acquired an interest in them."

The controlling question in this case, as we view it,
is whether the paintiff was a purchaser in good faith
within the meaning of the adjustment act of March 3,
1887. And, to determine whether he was
or was not such a purchaser, it may be well
to summarize the facts bearing thereon. The
land was patented to the state in trust for
the use and benefit of the railroad company when it should
comply with the terms of the grant of 1864. The rail-
road company by completing five ten-mile sections of the
road earned a certain number of acres of land, and the
land in controversy was within the limits of the third
ten-mile section. The railroad company never completed
the entire road, and hence never earned the entire grant.
Nor did the state construct the road that had been left
unconstructed by the railroad company. Under the terms
of the grant, if the road was not completed by the Sioux
City Company within ten years from its acceptance of
the grant, it had no right to unearned lands, and, if the
state failed to secure the completion of the road within
five years thereafter, the unearned lands reverted to the
United States. The Sioux City Company accepted the
grant in September, 1866, and constructed the five ten-
mile sections of its road in 1872. It had then earned
all of the lands that it ever earned, and soon thereafter
it received patents for more land than it had in fact
earned. See *Sioux City & St. Paul R. Co. v. United
States,* 159 U. S. 349 (16 Sup. Ct. 17, 40 L. Ed. 177).

1. PUBLIC LANDS:
railroad grant:
good faith
purchaser:
evidence:
statutes.

While the railroad company earned the land in controversy by the completion of its third section' of the road, when it accepted other land in place thereof and then failed to complete the road for which the grant was made, it had no right to the land in controversy, nor any equity therein, and it became a part of the unearned lands which reverted to the United States upon the failure of both the railroad company and the state to complete the road. *Sioux City & St. P. R. Co. v. U. S., supra.* The railroad company had no title to the land in controversy when it leased it to Fitzgerald, nor when it contracted to sell it to Ellen M. Childs in September, 1888. The company undoubtedly knew that it had no right to the land in controversy, and hence its acts were clearly not in good faith. When the plaintiff took an assignment of the Childs contract, he knew of the suit that had been brought by the United States to quiet its title to the unearned and unpatented lands, and that the land in controversy was included therein. He is presumed to have known the terms of the grant and the character of the railroad company's title, and he at least legally knew that it had absolutely no title. His agreement of October 8, 1889, with the railroad company furnishes abundant evidence of his complete knowledge of the whole situation. In addition thereto, he knew, in a general way at least, the history of the litigation over these lands, and that the title thereto was unsettled. After the defendant had taken possession of the land in 1890, the plaintiff made no move to regain possession, and, so far as the record shows, made no claim thereto until this action was commenced. From all of these facts and circumstances we think it must be said that the plaintiff was not a purchaser in good faith. Good faith in general means without notice, as well as for a valuable consideration. *Milton v. Boyd,* 49 N. J. Eq. 142 (22 Atl. 1078); *Tolbert v.*

*Horton,* 31 Minn. 518 (18 N. W. 647); *Kohl v. Lynn,* 34 Mich. 360.

In *Knepper v. Sands, supra,* it was held that, as the fourth section of the adjustment act of 1887 had no reference to unearned lands purchased after the date of that act, a purchaser thereafter could not become one in good faith within the meaning of the act.

In his reply the appellant says that he does not rely upon any rights under the adjustment act of 1887, except as he relies upon it through an estoppel. But the es-

2. EQUITABLE ESTOPPEL.

toppel relied upon is based on the claim that he was a good-faith purchaser under the act, and, when it is once determined that he did not so purchase, there can be no estoppel. To invoke the doctrine of equitable estoppel, the party claiming thereunder must show that he was himself unaware of the facts and had no convenient and available means of acquiring the knowledge. Where the facts are known to both parties, or where both have the same means of ascertaining the truth, there can be no estoppel. 11 Am. & Eng. Enc. Law (2d Ed.) 434.

The action of the officer of the land department in permitting the plaintiff to press his claim as a contract purchaser, and the subsequent issuance of a patent to

3. SAME.

him, does not estop the defendant from questioning the validity of such patent. *Gjerstadengen v. Van Duzen,* 7 N. D. 612 (76 N. W. 233, 66 Am. St. Rep. 679); *Walker v. Ehresman,* 79 Neb. 775 (113 N. W. 218). They were simply mistaken as to both the facts and the law, and the essential elements of an estoppel are lacking. The appellant's

4. PUBLIC LANDS: equitable title: notice.

proposition as to the joining of equitable and legal titles has no place here, for the reason that the plaintiff had actual notice of a hostile and superior title, and hence never had an equitable title himself.

It is said that the defendant obtained possession of said land by trespass, and because thereof that he can base no homestead rights thereon.   If it be conceded that the defendant's original possession of the particular land in controversy in 1890 was obtained by a trespass, it does not follow that he could thereafter obtain no homestead rights.  At the time of the trespass, he simply invaded the wrongful possession of another.  The land was not then subject to public entry for any purpose.  The plaintiff apparently acquiesced in the defendants' possession.   He at least made no protest, or claim against the defendant until after he received a patent, and, when the land became subject to public entry, the defendant had been in a peaceable and uninterrupted possession for several years.   Under such circumstances, we do not think the rule contended for by the appellant is applicable.   That the defendant made his homestead claim in good faith is established by the holding of *Ship Canal, Railway & Iron Co. v. Cunningham,* 155 U. S. 354 (15 Sup. Ct. 103, 39 L. Ed. 183).

5. SAME: homestead entry: trespass.

A careful examination of every question presented by the appellant and of the entire record leaves no doubt in our minds as to where the equities are.   We think the decree of the district court right, and it is therefore *affirmed.*

LADD, J., taking no part.